

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-18-1999

# Taylor v. Phoenixville Sch Dst

Precedential or Non-Precedential:

Docket 98-1273

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Taylor v. Phoenixville Sch Dst" (1999). *1999 Decisions.* Paper 225.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/225

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 18, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-1273

KATHERINE L. TAYLOR,
        Appellant

v.

PHOENIXVILLE SCHOOL DISTRICT

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 96-cv-08470)
District Judge: Honorable J. Curtis Joyner

Argued December 17, 1998

Opinion filed April 5, 1999

Panel Rehearing granted on August 18, 1999, vacating
Opinion filed April 5, 1999

Before: SLOVITER and COWEN, Circuit Judges and
RODRIGUEZ,* District Judge

(Filed August 18, 1999)

_____

* Honorable Joseph H. Rodriguez, U.S. District Judge for the District of
New Jersey, sitting by designation.

Joseph A. Ryan, Esq. (Argued)
13 Paoli Court
Paoli, PA 19301

 Counsel for Appellant

Michael I. Levin, Esq. (Argued)
Michael I. Levin & Associates
1800 Byberry Road
1402 Masons Mill Business Park
Huntington Valley, PA 19006

 Counsel for Appellee

OPINION OF THE COURT

COWEN, Circuit Judge.

Katherine Taylor brought suit under the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. S 12101 et seq., and the Pennsylvania Human Relations Act (PHRA), 43 Pa.Cons.Stat.Ann. S 951 et seq., alleging that her former employer, the Phoenixville School District, failed to provide her reasonable accommodations for her mental illness. The District Court granted summary judgment for the school district, reasoning that Taylor's mental illness, bipolar disorder, or manic depression as it is sometimes called, did not qualify as a disability under the ADA. Alternatively, the District Court held that even if Taylor did have a disability, the only accommodation she specifically requested, transfer to another position, was not possible, and consequently, she was not an otherwise qualified individual with a disability.

In an opinion filed on April 5, 1999, we reversed the District Court's order after we concluded that Taylor's unmedicated condition demonstrated that she has a disability; we also found that she raised genuine factual disputes on whether the school district participated in good faith in the interactive process required by the ADA. When the school district sought rehearing, we held its petition until the Supreme Court announced its decisions in two

2

then-pending cases addressing whether disabilities under the ADA are judged with or without regard to mitigating measures. The Supreme Court has now decided in Sutton v. United Airlines, Inc., ___ U.S. ___, 119 S.Ct. 2139 (1999) and Murphy v. United Parcel Service, ___ U.S. ___, 119 S.Ct. 2133 (1999) that whether a plaintiff has a disability under 42 U.S.C. S 12102(2)(A) must be evaluated taking into account any mitigating measures the plaintiff uses.

Based on these decisions, we have granted panel rehearing and vacated our prior opinion, which was reported at 174 F.3d 142. Applying the new law, we conclude that there are genuine factual disputes requiring a trial on whether Taylor's bipolar disorder substantially limits a major life activity while she is taking lithium. Because Sutton and Murphy concerned only the issue of when a plaintiff has a disability under the ADA, our previous discussion of the interactive process is unaffected; therefore, we have incorporated it unchanged in this opinion.

I

Before she was terminated on October 28, 1994, Katherine Taylor had worked for twenty years as the principal's secretary at the East Pikeland Elementary School in the Phoenixville School District. Prior to the fall of 1993, Taylor had not received a single disciplinary notice from any of the various principals she worked with over the years, and when formal evaluations were instituted in the 1991-92 school year, she received high praise.

Trouble began after Taylor suffered the onset of bipolar disorder in late August of 1993, regrettably during the first full week that a new principal, Christine Menzel, assumed her duties at East Pikeland. While Taylor was at work during that week, she began acting strangely, alarming Menzel and Linda Ferrara, the school district's administrative assistant for personnel. Menzel and Ferrara were so disturbed by Taylor's behavior that they doubted her capacity to leave on a train by herself and had someone at the school district contact her son, Mark Taylor. He soon drove his mother to Coastal Plain Hospital, a psychiatric

institution in Rocky Mount, North Carolina, where she was admitted as an in-patient on August 31, 1993.

Hospital records indicate that Taylor had become manic and was increasingly agitated and psychotic. According to the records, she hid herself at the train station, believing that someone was after her, and tried to disguise herself by covering her head with a scarf. On the car ride from Pennsylvania to the hospital, she was delusional and announced that the car was being escorted by state troopers and helicopters. She also claimed that her son's boss was after him and that there were many people on the highway who were "firefighters" trying to protect her. The hospital report noted that she did not have any insight into the severity of her condition and believed she was being admitted due to "acute stress." The school district's own expert, Dr. Rieger, agreed that during Taylor's hospitalization, she "clearly had paranoid delusions" and was hyperactive and psychotic.

Taylor was treated by two psychiatrists at the hospital who diagnosed her illness as bipolar disorder and treated her with lithium carbonate and an antipsychotic drug, Navane, when lithium alone was insufficient. Once her symptoms were brought under control by the combination of drugs, she was discharged on September 20, 1993, and her care was taken over by Dr. Louise Sonnenberg, a psychiatrist in Phoenixville, Pennsylvania. Since her discharge from the hospital, Taylor has continued to take lithium, see Dr. Sonnenberg, and receive the necessary, periodic blood tests.[1]

_____

1. One widely-used text explains that: "Because lithium has an extremely narrow therapeutic range, blood levels of the drug must be closely monitored. The occurrence and intensity of side effects are, in most cases, directly related to plasma concentrations of lithium. . . . The main toxic effects involve the gastrointestinal tract, the kidneys, the thyroid, the cardiovascular system, the skin, and the nervous system." Robert M. Julien, A Primer of Drug Action, 8th ed., W.H. Freeman & Co., at 229-30 (1998). The Physicians' Desk Reference, 53rd ed., Medical Economics Co., at 2750 (1999) is in agreement: "Lithium toxicity is closely related to serum lithium levels and can occur at doses close to therapeutic levels." Both authorities state that when the amount of lithium in the

4

Taylor's son stated in an affidavit that during his mother's leave of absence, he had numerous phone conversations with Ferrara in which he explained that his mother would be absent from work because she had been diagnosed with bipolar disorder and required hospitalization. Mark Taylor also asserted in his affidavit that during a phone call on October 8, one week before his mother resumed working, he told Ferrara that due to his mother's bipolar disorder, she "would require accommodations when she returned to work." The affidavit adds that he provided Ferrara with the information he received from Taylor's doctors "including diagnosis and treatment information and medications." Coastal Plain Hospital itself sent a letter to the school district on September 13, 1993, identifying one of Taylor's physicians and providing a phone number to address any additional questions the school district might have.

According to Taylor, Ferrara did eventually contact one of her treating physicians. Ferrara's own handwritten notes show that she attempted to obtain copies of Taylor's records from Coastal Plain Hospital and planned to speak to at least one of Taylor's doctors. The school district had other contact with her doctors because before Taylor was permitted to return to work, the school district required her to submit a note from Dr. Sonnenberg saying that Taylor was no longer disabled. Even prior to Mark Taylor's October 8th phone call, Ferrara sent a letter to the school district's superintendent, stating that:

> Mrs. Taylor has been released from the Coastal Plain Hospital in North Carolina and her son will be picking

_____

blood is near and above the therapeutic range, side effects can include nausea, vomiting, abdominal pain, slight tremor, lethargy, impaired concentration, dizziness, slurred speech, ataxia, muscle weakness, and nystagmus. Julien adds that memory problems and weight gain are also frequent complaints with continued treatment. As plasma levels rise higher, toxic effects include muscle rigidity, coma, renal failure, cardiac
arrhythmias, and death. Blood levels can fluctuate for a variety of reasons. For example, Julien notes that "when a patient lowers his or her salt intake or loses excessive amounts of salt (such as through sweating), lithium blood levels rise and intoxication may inadvertently follow." Id. at 228.

5

her up this coming weekend to bring her back to Pennsylvania. She will be receiving out-patient care in Phoenixville through the Phoenixville Psychiatric Associates. They will monitor her Blood Lithium[sic] levels. It was stressed that she must maintain and continue her medication. He felt, as well as the doctor, that the first week should be easing her transition back into the work place.

App. vol. I at 80.

A notation on the letter indicates that a copy was forwarded to Menzel. She submitted an affidavit, however, denying that she saw the memo and asserting that"I did not learn the specifics of the Plaintiff's alleged condition (i.e., bipolar disorder) until after reading a newspaper article describing her filing of the current lawsuit." App. vol. II at 2. Ferrara has also submitted an affidavit asserting that "at no time was I or anyone else at the School District aware of Plaintiff's alleged diagnosis of bipolar disorder or the details or frequency of any treatments she may have been receiving after returning from Coastal Plain until after the current lawsuit was filed." App. vol. II at 50.

After Taylor provided the note from Dr. Sonnenberg, she resumed work on October 15, 1993 although, as Ferrara's letter indicated, Taylor was only authorized to work half days for the first week. Prior to her hospitalization, Taylor had received high praise for her performance. In June of 1993, about two months before her hospitalization, the outgoing principal, Dr. Herron, wrote that Taylor"excels in all aspects" of her job, was a "credit to our school," and "a tribute to excellence." App. vol. I at 86. In a subsequent letter of recommendation, Dr. Herron again praised her performance without reservation:

As a secretary, Mrs. Taylor served me and the entire school family exceeding[ly] well. . . . I felt comfortable in leaving the building, sometimes for an extended amount of time, because of Mrs. Taylor's skills. Indeed, at such times, Mrs. Taylor carried on the full functions of the school as if she herself was capable of running the functions of the building without supervision, and, indeed, in such cases, she was entirely capable of doing so.

6

App. vol. I at 87.

Almost immediately upon Taylor's return to work, Menzel, following Ferrara's advice, began documenting errors Taylor committed. The errors were then compiled into a bullet-format list; the list was presented to Taylor; and soon thereafter Menzel and Ferrara would call her into a disciplinary meeting and offer her a chance to rebut the charges. A representative from Taylor's union also attended although it is unclear to what extent the representative participated.

Taylor's first disciplinary notice, dated November 9, 1993, listed errors as early as October 19, 1993, only four days after she returned to work and while she was still working part time. Eight more disciplinary notices followed, dated 11/23/93, 12/9/93, 1/6/94, 2/1/94, 3/11/94, 4/22/94, 9/2/94, and 10/27/94, the last arriving shortly before she was terminated. Over the course of the disciplinary meetings, Taylor disputed some charges and tried to explain others, but as 1994 wore on, Menzel documented many errors that she did not contest, and the interpersonal friction between Menzel and Taylor continued unabated. Disciplinary notices during this period list problems such as missed deadlines, mishandling of records, typing errors, interpersonal conflicts, and undelivered messages.

Part of Taylor's complaint about her treatment is that Menzel often did not speak to her informally and in-person about problems as they arose. Instead, Taylor alleges that Menzel documented every misstep, saved letters containing typos, photographed her desk and trash can, as well as the inside of the office refrigerator, and waited to confront her with the evidence in the disciplinary meetings.

Taylor also objects that the school district made her job more difficult upon her return from the hospital. First, during her absence, Menzel instituted a number of changes in the office: she introduced new office policies, created new forms, relocated documents, rearranged furniture, threw out Taylor's old filing system, and discardedfiles, including some in Taylor's desk. Taylor claims that these changes were disorienting and made it much more difficult to accomplish tasks she could easily perform before the

7

hospitalization. Of course, Taylor's absence coincided with the first weeks Menzel served as principal, and thus changes were inevitable and part of Menzel's prerogative as a new principal. The gravamen of Taylor's complaint, however, focuses on the abrupt, seemingly hostile manner in which the changes were made.

Compounding Taylor's difficulties, a new computer system was introduced to keep track of student records and other data. The school district points out that plans to introduce the computers had been underway prior to her hospitalization, and according to an affidavit submitted by a school-district employee, Taylor had more difficulty than the other secretaries at a training session conducted in July of 1993. Taylor does not appear to dispute that the school district was entitled to switch to computers; rather, the thrust of her objection seems to be that the school district raised another hurdle by the manner in which the new system was introduced when she returned from her hospitalization.

Taylor claims that her job was made more difficult in another, more straightforward way: following her return, her job description was changed, increasing the number of her job responsibilities from 23 to 42. It is not clear from the record when these changes were made, how substantial they were, or to what extent the new list simply enumerated in greater detail duties she already performed, but reading the evidence in the light most favorable to Taylor, there is reason to believe that the new list added significant responsibilities and made her return more difficult.

On September 2, 1994 Taylor received a notice placing her on probation for 30 days and informing her that if her performance did not improve, she would be terminated. She was in fact discharged on October 28, 1994 although her union representative subsequently negotiated with the school district to allow her to "retire" and receive some retirement benefits. Since her termination, Taylor has applied at different times for unemployment benefits and disability benefits.

II

The District Court had subject matter jurisdiction over Taylor's ADA claim pursuant to 28 U.S.C. S 1331 and

supplemental jurisdiction over her state-law claim pursuant to 28 U.S.C. S 1367. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291. Our review of a district court's grant of summary judgment is plenary. Olson v. General Electric Astrospace, 101 F.3d 947, 951 (3d Cir. 1996). In evaluating the school district's motion for summary judgment, we must determine whether there are any genuine disputes of material fact, and if not, then viewing the evidence in the light most favorable to the plaintiff, we must decide whether the school district was entitled to judgment as a matter of law. See Fed.R.Civ.P. 56; Celotex Corporation v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11 (1986).

III

A. Basic statutory framework

Under the ADA, employers are prohibited from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. S 12112(a). A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. S 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. S 12102(2).

In view of the foregoing definitions, we have held that in order for a plaintiff to establish a prima facie case of discrimination under the ADA, the plaintiff must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions

9

of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." Gaul v. Lucent Technologies, 134 F.3d 576, 580 (3d Cir. 1998) (citing Shiring v. Runyon, 90 F.3d 827, 831 (3d Cir. 1996)).

Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities. The ADA specifies that an employer discriminates against a qualified individual with a disability when the employer does "not mak[e] reasonable accommodations to the known physical or mental limitations of the individual unless the[employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the [employer]." 42 U.S.C. S 12112(b)(5)(A).

Before turning to the first issue, whether Taylor has a disability under the ADA, we mention that we will only discuss Taylor's ADA claim because our analysis of an ADA claim applies equally to a PHRA claim. Kelly v. Drexel University, 94 F.3d 102, 105 (3d Cir. 1996).

B. Does Taylor have a disability under the ADA?

According to the statutory language quoted above, Taylor can establish that she has a disability if she has a mental impairment that substantially limits a major life activity, has a record of such an impairment, or is regarded as having such an impairment. 42 U.S.C. S 12102(2). Taylor argues that she can satisfy each of these standards, but because we conclude that she raises genuine factual disputes about whether her bipolar disorder substantially limits a major life activity, we need not reach her arguments on the second and third definitions of a disability.[2]

_____

2. The parties' briefing on appeal has focused heavily on the first standard -- does Taylor have an impairment that substantially limits a major life activity? What discussion there was of the second and third standards for having a disability did not address whether a plaintiff who relies exclusively on either the "regarded as" standard or the "record of a substantially limiting impairment" standard is legally entitled to reasonable accommodations.

No one disputes that bipolar disorder counts as a mental impairment under the ADA; the contested issue is whether Taylor's bipolar disorder substantially limits a major life activity. In determining whether a plaintiff's impairment substantially limits a major life activity, the Supreme Court has stressed that courts should "determine the existence of disabilities on a case-by-case basis." Albertsons, Inc. v. Kirkingburg, ___ U.S. ___, 119 S.Ct. 2162, 2169 (1999). To make that individualized assessment, we must begin by identifying the specific life activity or life activities that Taylor says her disorder affected and then evaluate whether her condition "substantially limits" those life activities.

When Taylor relied upon our prior holding that disabilities are judged in their untreated state, she contended that while she was hospitalized, her bipolar disorder affected a number of her major life activities, such as the ability to think and care for herself. Following the decisions in Sutton and Murphy, which require courts to evaluate disabilities in their treated condition, Taylor submitted supplemental briefing that shifted the emphasis to her ability to think.

We accept that thinking is a major life activity. We have previously observed that "[t]he ADA does not define `major life activities,' " Kelly, 94 F.3d at 105 (citation omitted), but despite the comparative lack of guidance in the statute, we conclude that it is reasonable to include thinking as a

_____

We have previously identified, without deciding, the issue of whether a "regarded as" plaintiff is entitled to accommodations. See Taylor v. Pathmark Stores, Inc., 177 F.3d 180, 195-96 (3d Cir. 1999); Deane v. Pocono Medical Center, 142 F.3d 138, 140-41 (3d Cir. 1998)(en banc). Although those cases addressed the "regarded as" standard, the "record of an impairment" standard may raise similar considerations.

We need not resolve these difficult issues in our present decision. Given that we have other grounds for reversal, intervening law has affected the "regarded as" standard, and important issues were left unaddressed by the parties, we will allow the parties to pursue on remand whether Taylor is regarded as disabled or has a record of a substantially limiting impairment and, if so, whether she would be entitled to reasonable accommodations under either of those standards.

11

major life activity. We hardly need to point out that thinking is inescapably central to anyone's life. Perhaps the activity is rather broad, but given the difficulty of specifying the different constituents of thinking or otherwise narrowing this central activity (especially when discussing the effects of psychosis or its subclinical manifestations), we will not try to constrict Taylor's arguments about how her condition affects her ability to think. We think that most objections about the broadness of thinking as a life activity can be captured in the analysis of when the activity is substantially limited.

The Supreme Court has said, "The ADA does not define `substantially limits,' but `substantially' suggests `considerable' or `specified to a large degree.' " Sutton, 119 S.Ct. at 2150. But while substantial limitations should be considerable, they also should not be equated with"utter inabilities." Kirkingburg, 119 S.Ct. at 2168 (quoting Bragdon v. Abbott, 524 U.S. 624, 641, 118 S.Ct. 2196 (1998)).

The EEOC's regulations define "substantially limits" as follows: "(i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. S 1630.2(j)(1). The regulations include the following factors for evaluating when someone is substantially limited in a major life activity:"(1) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. S 1630.2(j)(2).

The Supreme Court left unresolved in Sutton what deference, if any, these regulations are due. The Court stated that even though the EEOC is charged with issuing regulations for the employment provisions under Title I of the ADA, "[n]o agency, however, has been given authority to issue regulations implementing the generally applicable provisions of the ADA, see SS 12101-12102, which fall

12

outside Titles I–V." Sutton, 119 S.Ct. at 2145. The Court concluded that it did not have to resolve the issue of deference because the parties in Sutton did not contest the validity of the regulations, including 29 C.F.R.S 1630.2(j), that interpret the generally applicable provisions. Id. Because we have previously applied 29 C.F.R. S 1630.2(j), see, e.g., Kelly, 94 F.3d at 105, we will follow it here as well.

When Taylor had to be confined to a hospital because she was psychotic, increasingly agitated, and gripped by delusions, the limitations on her ability to think were severe: She suffered paranoid delusions that people were trying to kill her, inducing her to disguise herself at the train station. During the car ride to the hospital, she thought her son's life was in danger, believed that the highway patrol was escorting her, and thought the highway was filled with "firefighters" there to protect her. Unable to recognize that these beliefs were baseless, she explained at the time of her admission that she was there for"acute stress."

Both the school district's expert and Taylor's treating physician agreed that Taylor has bipolar disorder and that the condition is chronic. Dr. Rieger, the school district's expert, added, "There is no doubt in my mind that Ms. Taylor experienced a biologic psychiatric illness in which genetic factors play a role. These illnesses can appear even fairly late in life regardless of life events and stressors. . ." App. vol. I at 157. Dr. Sonnenberg, Taylor's treating physician, confirmed that Taylor has an ongoing condition that requires her to stay on lithium,3  and according to Dr.

---

3. The District Court evidently refused to consider Dr. Sonnenberg's opinion because the Court said, citing Gaul v. AT&T, Inc., 955 F. Supp. 346 (D.N.J. 1997), Taylor could not rely on the opinion of her own treating physician. But Gaul stated that"[i]t is well settled that treating
physicians may testify as to any subject relevant to the evaluation and treatment of their patients." Id. at 349. At issue in Gaul was whether testimony by the plaintiff's treating physician satisfied the New Jersey Supreme Court's holding that "expert medical testimony is required to establish the fact of the employee's [handicap]." Id. (quoting Clowes v. Terminex International, Inc., 109 N.J. 575, 597 (1988)). Just as the District Court in Gaul deemed admissible the opinion of a plaintiff's treating physician, we hold that a plaintiff in an ADA case can rely on the testimony of his or her treating physician to demonstrate that the plaintiff has a disability.

Rieger's report, Taylor has continued to take 300 mgs. of lithium twice a day. In short, Taylor's impairment is not temporary,[4] and it is clear that at the time of her hospitalization, her impairment was substantially limiting. But the central question, in light of Sutton and Murphy, is whether Taylor's continuing impairment remained a "disability" under the ADA by imposing substantial limitations even while treated. Specifically, Taylor must show that she was substantially limited during the year following her hospitalization, the time span when she says that she was denied reasonable accommodations.

Taylor maintains that even though lithium has improved her condition and has reduced the risk of full-blown psychotic episodes, the drug has not perfectly controlled her symptoms, leaving her still substantially limited in her ability to think. She argues that Dr. Sonnenberg's notes indicated that she continued to suffer symptoms of her disorder, including paranoia. On November 9, 1994, a couple of months after Taylor started taking lithium, Dr. Sonnenberg wrote a short note to the school district, explaining that Taylor was temporarily unable to work. Taylor's claims of uncontrolled, ongoing symptoms are corroborated by a number of other sources as well. Lithium has a very narrow therapeutic range, and blood levels of the drug can fluctuate for a variety of reasons. See supra, at n.1. Throughout the 1993-94 school year following her hospitalization, she experienced enough difficulty that she saw Dr. Sonnenberg twenty-five times even though Taylor, who earned a secretary's salary, cares for a disabled child, and is divorced, had to pay the $120 fee out of pocket and was reimbursed only half the cost by her insurance. One can infer that she would not have undertaken such expense without experiencing serious difficulty. Taylor also points out that prior to her hospitalization, she had received high praise for her work performance, but after the onset of her illness, she encountered a number of problems, as the school district's records document. Therapeutic levels of

_____

4. See, e.g., Diagnostic and Statistical Manual of Mental Disorders, 4th Ed., American Psychiatric Association, at 353 (1994); Frederick Goodwin and Kay Redfield Jamison, Manic-Depressive Illness, Oxford University Press, ch. 23 (1990); Julien, supra, n.1 at 232.

lithium can cause a number of side effects. See supra, at n.1. Some of these effects, like the nausea Taylor complained of, may bear indirectly on the ability to think, while other side effects, such as impaired concentration and memory problems, bear directly on thinking. Taylor's problems at work may have been related to these drug side effects, and the Supreme Court has noted that drug side effects can be important in evaluating whether someone is disabled. Sutton, 119 S.Ct. at 2147.

Given our prior holding in Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933 (3d Cir. 1997), Taylor not surprisingly focused on her untreated condition when she accumulated evidence to demonstrate that she had a disability, and as a consequence, the record is not as fully developed as it might be. Nevertheless, we believe that she has presented sufficient evidence to require a trial on whether she continued to be substantially limited even while receiving treatment.

Although Taylor clearly was disabled at the time she was hospitalized, she need not prove that she continued to experience symptoms of that magnitude: paranoia and distorted mood can have a "substantial" or "considerable" impact on Taylor's thinking well before they force hospitalization. Substantial limitations need not rise to the level of the "utter inabilities" Taylor experienced at the time of her hospitalization. When we consider the nature and severity of the impairment, its duration, and its expected long-term impact, see 29 C.F.R. S 1630.2(j)(2), we find evidence that Taylor has had to contend with a serious, very much ongoing condition. Following the initial severe episode, she again had to leave work just a few months later; she sought treatment twenty-five times throughout the year; and every day throughout this period she took medication requiring careful monitoring. That she may not have experienced problems every day does not defeat her claim. Chronic, episodic conditions can easily limit how well a person performs an activity as compared to the rest of the population: repeated flare-ups of poor health can have a cumulative weight that wears down a person's resolve and continually breaks apart longer-term projects.

15

The school district argues vehemently that Taylor is not disabled and points to the report of its expert. After conducting an office visit with Taylor on June 24, 1997, Dr. Rieger concluded: "When I examined Ms. Taylor[,] she had a normal mental state. Her chronic biological psychiatric illness was obviously well controlled by medication. If she continues to take her medications as instructed[,] she will be able to work. She is now not at all disabled from a psychiatric point of view." App. vol. I at 159.

We do not think Dr. Rieger's report is sufficient to grant summary judgment in the school district's favor. Taylor has presented evidence that she is disabled, and on summary judgment we read the evidence in the light most favorable to the nonmoving party and resolve genuine factual disputes in favor of the nonmoving party. See Fed.R.Civ.P. 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S.Ct. 2505, 2510-11 (1986). Dr. Rieger's report also has a number of problems that could lead a reasonable jury to reject it. The passage quoted above, for example, says that Taylor is not presently, on June 24, 1997, exhibiting the symptoms of her disorder. That statement does not resolve what Taylor's condition was like between the fall of 1993 and the fall of 1994. Taylor may have gained better control over her condition by the time roughly four years had passed from the onset of her disorder.

Another shortcoming of Dr. Rieger's report is that it is based on one office visit. A jury could question whether he relied on too slender a base of experience observing Taylor's condition. It is true that the doctor was able to review a number of documents, including Taylor's disciplinary reports from the school district and the reports from Coastal Plain Hospital, but these reports may not have given a very full or accurate picture of the range of symptoms Taylor experienced while on medication.

We think it is significant that Taylor had difficulty recognizing and expressing the symptoms of her condition. Not only did she believe at the time of her hospitalization that she was merely suffering from "acute stress," but this difficulty seemed to continue. Dr. Rieger's own report reveals this problem. When he asked Taylor to describe the

16

events leading up to her hospitalization, she related that Ferrara told her "she needed some rest." App. vol. I at 150.

> Upon my question Ms. Taylor revealed what prompted this recommendation: "I was telling [Ferrara] about a person who was employed by the district. I remarked that the person was dead -- strike that -- was injured. I had passed an ambulance. That person was on my mind. It was a strange remark that wasn't true." Upon my question Ms. Taylor agreed that in retrospect what she just told me sounded like a delusion. She immediately continued her story: "I had planned to take time off. I had Amtrak tickets to see my mother in Rocky Mount, North Carolina. I didn't get there. The train was canceled because of a hurricane. My son took me there by car. My brother made arrangements for me to go to the Coastal Plains Hospital." Upon my question she confirmed that the entire trip was planned so that she could go to a psychiatric hospital near her relatives. She could not recall what specific delusions she voiced upon entering the hospital. She recalled that she gave the doctors lots of information, that she was "very talkative" although very tired. [Elsewhere the report quotes Taylor as saying"some nights I got only 3 to 4 hours of sleep."] Upon my question she admitted that she may have been euphoric.

Id. One would expect a plaintiff to inflate the severity of her condition when talking to opposing counsel's expert. Taylor instead made her hospitalization sound like a simple trip to visit her mother and had obvious difficulty conveying the extent of her illness. We should not insist that all plaintiffs with bipolar disorder must have the self-awareness and expressive powers of a Robert Lowell (who had the illness) before we allow that their condition is substantially limiting.

After reviewing the school district's records, Dr. Rieger did express the opinion that Taylor's "misconduct was solely due to her basic personality," and "[w]hatever subjective difficulties she experienced during her last year of employment were not due to her mental illness but due to her peculiar personality traits. . . ." Id. at 158 and 156. In

17

a similar vein, he asserted that people with bipolar disorder can "fulfill all their work duties to the full satisfaction of their superiors without engaging in misconduct and without requiring any accommodations." Id. at 159.

A reasonable jury could question the doctor's conclusion that all of Taylor's problems at work were due solely to her "peculiar personality traits" and not to her mental illness. Taylor had performed very well at work prior to the onset of her illness; only after she became psychotic and was hospitalized did problems appear. Thus, a reasonable jury could find it surprising that the peculiar personality traits only manifested themselves after she became ill. It also is not clear that the doctor was in a position to judge when Taylor had engaged in "misconduct" at work; a reasonable jury could question any uncritical reliance on the school district's own reports about Taylor.

Another reason that the school district denies that Taylor is disabled is that before the school district allowed Taylor to return to her job, she was required to submit a note from her doctor saying that she was able to work. Dr. Sonnenberg responded to this requirement by sending a one sentence message saying that Taylor "is able to return to work and is not disabled." Supp. App. at 1. The school district argues that since the doctor said that Taylor was "not disabled," Taylor must have been symptom free.

But the doctor's remark appears to be simply another way of saying that Taylor was capable of working. It is hardly conclusive proof that Taylor was not substantially limited. That Dr. Sonnenberg used "disabled" as the equivalent of "able to work" is supported by her earlier note in November that said Taylor "is temporarily disabled and not able to work at this time." App. vol. I at 77. While the doctor's use of the term "disabled" is not unusual, especially in the context of disability insurance, it is not an accurate definition for the purposes of the ADA. To say that no one is disabled under the ADA unless the person is unable to work would render all the provisions in the ADA governing reasonable accommodations at work entirely empty of meaning. If there has ever been a legal term of art, "disabled" certainly qualifies. And the Supreme Court recently rejected glib estoppel arguments that turn on the

18

different meanings carried by the term "disability."
Cleveland v. Policy Management Systems Corp., ___ U.S.
___, 119 S.Ct. 1597 (1999).

C. Reasonable accommodations

Having concluded that there are genuine factual disputes
about whether Taylor has a disability under 42 U.S.C.
S 12102(2)(A), we must consider whether the school district
failed to provide reasonable accommodations. On this issue,
we find that the District Court applied the wrong legal
standards and that under the correct standard, disputes of
material fact remain, requiring remand.

As stated above, an employer commits unlawful
discrimination under the ADA if the employer does"not
mak[e] reasonable accommodations to the known physical
or mental limitations of an otherwise qualified individual
with a disability who is an applicant or employee, unless
[the employer] can demonstrate that the accommodation
would impose an undue hardship on the operation of the
business of [the employer]." 42 U.S.C. S 12112(b)(5)(A).

In evaluating whether a plaintiff is a "qualified individual
with a disability," we have held that a plaintiff must
"satisf[y] the prerequisites for the position, such as
possessing the appropriate educational background,
employment experience, skills, licenses, etc." and, the
plaintiff must be able to "perform the essential functions of
the position held or desired, with or without reasonable
accommodations." Gaul, 134 F.3d at 580 (quoting 29 C.F.R.
Pt. 1630, App. S 1630.2(m) at 351). Because Taylor held her
position as secretary to the principal for many years,
receiving high praise, there is no serious dispute that she
satisfies the prerequisites for the position. The critical issue
is whether Taylor could, with reasonable accommodations,
perform the essential functions of her job following her
return from her hospitalization.

The Interactive Process

The ADA's regulations state that: "To determine the
appropriate reasonable accommodation it may be necessary
for the [employer] to initiate an informal, interactive process

19

with the [employee] in need of accommodation. This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. S 1630.2(o)(3). Similarly, the EEOC's interpretive guidelines provide that: "Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the [employee] with a disability." 29 C.F.R. Pt. 1630, App. S 1630.9 at 359.

We have previously recognized both this regulation and the EEOC's interpretive guideline and applied them to a claim brought under the Rehabilitation Act, 29 U.S.C. S 701, et seq. Mengine v. Runyon, 114 F.3d 415, 419-20 (3d Cir. 1997); see also Deane v. Pocono Medical Center, 142 F.3d 138, 149 (3d Cir. 1998)(en banc).5  Based on the regulation and interpretive guidelines, we held in Mengine that "both parties have a duty to assist in the search for appropriate reasonable accommodation and to act in good faith." Id. We noted that other circuits have taken this view. See, e.g., Beck v. University of Wisconsin Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir. 1996)("A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith."); Taylor v. Principal Financial Group, Inc., 93 F.3d 155, 165 (5th Cir. 1996)(The "employee's initial request for an accommodation... triggers the employer's obligation to participate in the interactive process...").

In Bultemeyer v. Fort Wayne Community Schools , 100 F.3d 1281 (7th Cir. 1996) an employee diagnosed with paranoid schizophrenia and bipolar disorder sought to

_____

5. While Mengine involved a claim under the Rehabilitation Act, the regulation and interpretive guidelines applied in the case were from the ADA. Furthermore, according to 42 U.S.C. S 12201(a), the ADA should not be construed to apply a lesser standard than the Rehabilitation Act. See also Bragdon v. Abbott, 118 S.Ct. 2196, 2202 (1998).

return from an extended disability leave to his job as a custodian. His employer informed him that he would be reassigned to the largest school operated by Fort Wayne Community Schools, and added that he would not receive any special accommodation. The employer then instructed the plaintiff to take a physical and report to work or else he would be terminated. After touring the new school with the custodial foreman, the plaintiff told his employer that he did not think he was equal to the task but said he was not resigning. The plaintiff subsequently failed to take the physical or report to work although he did have his psychiatrist send a letter to the employer which stated that due to the plaintiff's illness, it would be in the plaintiff's best interest to work at a less stressful school. The employer never responded and terminated the plaintiff. The Seventh Circuit, reversing summary judgment for the employer, concluded that there was a genuine dispute as to whether the employer engaged in the interactive process of seeking accommodations.

We agree with the Seventh Circuit which held that:

> An employee's request for reasonable accommodation requires a great deal of communication between the employee and employer... [B]oth parties bear responsibility for determining what accommodation is necessary... `[N]either party should be able to cause a breakdown in the process for the purpose of either avoiding or inflicting liability. Rather, courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.'

Bultemeyer, 100 F.3d at 1285 (quoting Beck, 75 F.3d at 1135).

Our analysis of the interactive process in the present case is divided into two steps: first, we will clarify what

21

notice must be given to the employer to trigger the employer's obligations under the interactive process, and second, we will elaborate on the employee's and the employer's duties once the interactive process comes into play.

1. Notice of the disability and request for accommodation

The first question we must address is who must make the request for accommodation and what form that request must take. The EEOC compliance manual provides that"a family member, friend, health professional, or other representative may request a reasonable accommodation on behalf of an individual with a disability."2 EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 20-21. Likewise, in Bultemeyer the Seventh Circuit allowed that an employee's psychiatrist could make a request for accommodations on behalf of an employee. Bultemeyer, 100 F.3d at 1286. In our case, therefore, Taylor's son could make the initial request for accommodations.

The EEOC's manual further provides that "[r]equests for reasonable accommodations do not need to be in writing," 2 EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 21, and "[t]o request accommodation, an individual may use `plain English' and need not mention the ADA or use the phrase `reasonable accommodation.' " Id. at 19. The Seventh Circuit said that "properly participating in the interactive process means that an employer cannot expect an employee to read its mind and know that he or she must specifically say`I want reasonable accommodation,' particularly when the employee has a mental illness." Bultemeyer, 100 F.3d at 1286.

The EEOC's manual makes clear, however, that while the notice does not have to be in writing, be made by the employee, or formally invoke the magic words "reasonable accommodation," the notice nonetheless must make clear that the employee wants assistance for his or her disability. In other words, the employer must know of both the disability and the employee's desire for accommodations for that disability.

These rules are consistent with the statute which says that the employer must make reasonable accommodations to an employee's "known" disability. 42 U.S.C. S 12112(b)(5)(A). What matters under the ADA are not formalisms about the manner of the request, but whether the employee or a representative for the employee provides the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation.

What information the employee's initial notice must include depends on what the employer knows. In Taylor v. Principal Financial Group, Inc., 93 F.3d 155 (5th Cir. 1996), an employee whose job performance had fallen off mentioned to his employer that he was diagnosed with bipolar disorder. Nothing the employee had done suggested the nature of his illness. When the employer, who said he did not know about the illness, asked the employee if he was okay, the employee responded that he was. The employee never offered further information about his disorder and, even more significantly, could not confirm that he ever explicitly asked for an accommodation or help of any sort. Under these circumstances, the employee has not given sufficient notice to trigger the employer's duty to engage in the interactive process. Cf. Crandall v. Paralyzed Veterans of America, 146 F.3d 894 (D.C. Cir. 1998)(Employee with bipolar disorder could not state a claim under the Rehabilitation Act when he never told his employer of his mental illness and never requested accommodations.). Employers cannot assume employees are disabled and need accommodations.

Our case differs markedly. It is undisputed that Taylor became psychotic at work, that the school district knew she was hospitalized immediately thereafter, and that Coastal Plain Hospital contacted the school district by letter about Taylor's hospitalization and provided a phone number to answer questions. It is also undisputed that Ferrara wrote a note saying she planned to contact Taylor's doctors and that she wrote a letter to the superintendent, stating that "Phoenixville Psychiatric Associates... will monitor [Taylor's] Blood Lithium [sic] levels. It was stressed that she must maintain and continue her medication." The school district

23

also does not deny that it required Taylor to submit a note from Dr. Sonnenberg, further demonstrating that the school district knew how to get information from Taylor when it deemed it necessary.

Based on this evidence, the school district had more than enough information to put it on notice that Taylor might have a disability, and therefore, in order to trigger the school district's obligation to participate in the interactive process, Taylor or her representative only needed to request accommodation. In light of the undisputed background information putting the school district on notice that Taylor had recently developed a serious disability, we think it would be especially inappropriate to insist that Taylor's son must have specifically invoked the ADA or used the words "reasonable accommodation" when he requested accommodations. Under the circumstances, it hardly should have come as a surprise that Taylor would want some accommodations, particularly as the successive disciplinary meetings began to mount for an employee who had previously performed very well. We would add that the school district had ample time to seek legal advice on its obligation to provide reasonable accommodations. Regardless, Taylor's son has submitted an affidavit saying that not only did he provide diagnostic and treatment information to the school district, he also asked for "accommodations" for his mother.

Menzel's affidavit asserts that she did not "learn the specifics" of Taylor's disorder until after this litigation was started. Ferrara's affidavit states, "To my knowledge, at no time was I or anyone else at the School District aware of Plaintiff's alleged diagnosis of bipolar disorder or the details or frequency of any treatments she may have been receiving after returning from Coastal Plain until after the current lawsuit was filed."

We want to make clear that the school district's duty to participate in the interactive process is triggered if Taylor notified either Menzel who was Taylor's supervisor and East Pikeland's principal, or Ferrara, the school district's administrative assistant for personnel. Thus, if Taylor's son requested accommodations from Ferrara, then the school district would have a duty to participate in the interactive

24

process regardless of how much Menzel knew about Taylor's disorder.

We would add that to trigger the school district's duty to participate in the interactive process, it is not essential that Ferrara or Taylor knew the specific name of Taylor's condition although Taylor's son has created a factual dispute on this issue by saying that he provided Ferrara with diagnostic and treatment information. Suffice it to say that there is no genuine dispute that the school district was aware that Taylor exhibited serious psychiatric problems and those problems were severe enough to require her to be hospitalized for roughly three weeks. Following Taylor's discharge from the hospital, the school district knew that Phoenixville Psychiatric Associates monitored the lithium Taylor was taking and that Taylor continued to see a psychiatrist. Taylor also provided the school district with a number of avenues for obtaining further information from her doctors, avenues that the school district used. If there was any further information that the school district felt it needed to justify an accommodation, it was incumbent on the school district to ask for it. As the Seventh Circuit has said, "The employer has to meet the employee half-way." Bultemeyer, 100 F.3d at 1285. To raise the bar for triggering the interactive process any further would essentially nullify the process.

Once the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs. Disabled employees, especially those with psychiatric disabilities, may have good reasons for not wanting to reveal unnecessarily every detail of their medical records because much of the information may be irrelevant to identifying and justifying accommodations, could be embarrassing, and might actually exacerbate workplace prejudice. An employer does not need to know the intimate details of a bipolar employee's marital life, for example, in order to identify or justify an accommodation such as a temporary transfer to a less demanding position.

Another reason for placing some burden on the employer is that, as the Seventh Circuit recognized in Bultemeyer, an

25

employee with a mental illness may have difficulty effectively relaying medical information about his or her condition, particularly when the symptoms are flaring and reasonable accommodations are needed. Id. See also Criado v. IBM Corp., 145 F.3d 437, 444 (1st Cir. 1998)(When an employer terminated an employee with a mental illness due to an alleged miscommunication over a leave of absence, a jury could find that the employer failed to live up to its responsibility to help find accommodations.). It is worth noting that Taylor's hospital records specifically stated that at the time of her hospitalization, she "lacked insight" into her condition and believed her only problem was"acute stress."

## 2. Application of the interactive process following adequate notice

Viewing the evidence in the light most favorable to Taylor, we believe that a reasonable jury could conclude, based on the evidence presented thus far, that the school district did not meet its burden under the interactive process. Taylor's version of the case can be stated succinctly as follows: After Menzel and Ferrara watched Taylor become manic and require hospitalization, the two decided that Menzel should begin documenting Taylor's every error within days of her return, despite the fact that Taylor's son requested accommodations, informed them about Taylor's condition, and provided them with the means to obtain more information if needed. Notwithstanding Taylor's previous twenty years of strong performance and the school district's clear notice of Taylor's disability and desire for accommodations, the school district offered no accommodations or assistance in finding them, made Taylor's job more difficult, and simply sat back and continued to document her failures. A reasonable jury could conclude that the school district did not engage in an interactive process of seeking accommodations and is responsible for the breakdown in the process.

The school district emphasizes that the only accommodation Taylor specifically requested was transfer to another position, which Taylor later conceded was not feasible. We do not think that it is fatal to Taylor's claim that her son did not request a specific accommodation or

26

that Taylor's request in March of 1994 was for an accommodation that she admitted was not possible. The interactive process, as its name implies, requires the employer to take some initiative. In Bultemeyer, the court explained, "If the note [from the psychiatrist requesting accommodation] was too ambiguous and [the employer] did not know what Bultemeyer wanted, [the employer] easily could have called [the psychiatrist] for a clarification." Bultemeyer, 100 F.3d at 1285. The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the proactive process intended: it does not help avoid litigation by bringing the parties to a negotiated settlement, 6 and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow. In addition, in some cases courts may be better positioned to judge whether the employer met with the employee in good faith than to judge how burdensome a particular accommodation really is.

The ADA's regulations make clear that the purpose of the interactive process is to determine the appropriate accommodations: "This process should identify the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." 29 C.F.R. S 1630.2(o)(3). Therefore, it would make little sense to insist that the employee must have

_____

6. In Deane we emphasized the value of the interactive process for avoiding litigation: "we take this opportunity to observe that this protracted (and very much ongoing) litigation would likely have been unnecessary had the parties taken seriously the precepts announced in our opinion in Mengine." Deane 142 F.3d at 149 (citation omitted). We would add that the interactive process can be thought of as a less formal, less costly form of mediation. See 67 U.S.L.W. 2255 (noting the value of mediated settlement in ADA cases). Mediated settlements, the article explains, are cheaper than litigation, can help preserve confidentiality, allow the employee to stay on the job, and avoid monetary damages for an employer's initially hostile responses to requests for accommodations. The interactive process achieves these same goals even more effectively.

27

arrived at the end product of the interactive process before the employer has a duty to participate in that process. The EEOC's interpretive guidelines squarely place some of the burden on the employer by stating that "the employer must make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. Pt. 1630, App. S 1630.9 at 359.

As we explained in Mengine, the process must be interactive because each party holds information the other does not have or cannot easily obtain. We noted that "employers will not always know what kind of work the worker with the disability can do, and conversely, the worker may not be aware of the range of available employment opportunities, especially in a large company. Thus, the interactive process may often lead to the identification of a suitable position." Mengine, 114 F.3d at 420. More specifically, we explained that while an employee who wants a transfer to another position ultimately has the burden of showing that he or she can perform the essential functions of an open position, the employee does not have the burden of identifying open positions without the employer's assistance. "In many cases, an employee will not have the ability or resources to identify a vacant position absent participation by the employer." Mengine, 114 F.3d 420.7 Taylor's concession that she knew of no other open positions, therefore, should not necessarily be the end of the matter if the school district made no effort to help investigate.

When transfer is not sought, as was presumably the case when Taylor's son first requested accommodations, the employer likewise will often hold more information than the employee about what adjustments are feasible in the employee's current position. The Seventh Circuit pointed out in Bultemeyer that: "When Bultemeyer worked at North Side High School, a simple adjustment in his duties was

_____

7. Our opinion in Gaul v. Lucent Technologies, Inc., 134 F.3d 576 (3d Cir. 1998) should be distinguished because there the employee's proposed accommodation, a transfer whenever he decided he was stressed, was unreasonable as a matter of law. If an employee insists on a single accommodation that is unreasonable as a matter of law, then the employee will be at fault for the breakdown in the interactive process.

28

enough of an accommodation to enable him to work there. But this time, we do not know what might have happened, because [the employer] was unwilling to engage in the interactive process and accommodation him." Bultemeyer, 100 F.3d at 1285.

In short, an employer who has received proper notice cannot escape its duty to engage in the interactive process simply because the employee did not come forward with a reasonable accommodation that would prevail in litigation. Participation is the obligation of both parties, however, so an employer cannot be faulted if after conferring with the employee to find possible accommodations, the employee then fails to supply information that the employer needs or does not answer the employer's request for more detailed proposals. And while a specific request may not always be necessary to initiate the process, it certainly helps bolster the employee's claim that the employer knew that the employee wanted accommodations.

The interactive process does not dictate that any particular concession must be made by the employer; nor does the process remove the employee's burden of showing that a particular accommodation rejected by the employer would have made the employee qualified to perform the job's essential functions. See Walton v. Mental Health Association of Southeastern Pennsylvania, 168 F.3d 661, 670 (3d Cir. 1999). All the interactive process requires is that employers make a good-faith effort to seek accommodations.

Employers can show their good faith in a number of ways, such as taking steps like the following: meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered employee's request, and offer and discuss available alternatives when the request is too burdensome. These steps are consistent with the recommendations in the EEOC's interpretive guideline. See 29 C.F.R. Pt. 1630, App. S 1630.9 at 359-61. We do not think this process is especially burdensome. As we found in Mengine, the Postal Service engaged in good faith in the interactive process when it exchanged a number

29

of letters with an employee in an effort to identify a vacant position for reassignment and sent the employee multiple job descriptions of vacant positions. Mengine, 114 F.3d at 421.8

The school district can be understood as arguing implicitly that it did not have to participate in the interactive process because there was no feasible accommodation that would have made Taylor capable of performing the essential functions of her job. In Mengine we stated that "if reasonable accommodation is impossible, nothing more than communication of this fact is required. Nonetheless, if an employer fails to engage in the interactive process, it may not discover a way in which the employee's disability could have been reasonably accommodated, thereby risking violation of the Rehabilitation Act." Mengine, 114 F.3d at 420-21. We explained that whether an employer's duty to participate in the interactive process has been discharged will often be a matter of "timing": i.e., the employer will almost always have to participate in the interactive process to some extent before it will be clear that it is impossible to find an accommodation that would allow the employee to perform the essential functions of a job.

Put differently, because employers have a duty to help the disabled employee devise accommodations, an employer who acts in bad faith in the interactive process will be liable if the jury can reasonably conclude that the employee would have been able to perform the job with accommodations. In making that determination, the jury is entitled to bear in mind that had the employer participated in good faith, there may have been other, unmentioned possible accommodations. On the other hand, as we

_____

8. Employers may find it useful to take advantage of the Job Accommodation Network although we do not in any way suggest that employers are obliged to make use of this service. The EEOC compliance manual explains that: "The Job Accommodation Network (JAN) provides advice free-of-charge to employers and employees contemplating reasonable accommodation. JAN is a service of the President's Committee on Employment of People with Disabilities which, in turn, is funded by the U.S. Department of Labor. JAN can be reached at 1-800-ADA-WORK." EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 23 n.56.

30

explained in Mengine, "The ADA, as far as we are aware, is not intended to punish employers for behaving callously if, in fact, no accommodation for the employee's disability could reasonably have been made." Mengine, 114 F.3d at 420 (quoting Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997)).

When an employee has evidence that the employer did not act in good faith in the interactive process, however, we will not readily decide on summary judgment that accommodation was not possible and the employer's bad faith could have no effect. To assume that accommodation would fail regardless of the employer's bad faith would effectively eliminate the requirement that employers must participate in the interactive process. An employer who acted in bad faith would be in essentially the same, if not better, position than one who participated; that is, both employers would be arguing that the employee failed to find an accommodation making him or her able to perform the essential function of the job. The less the employer participated, the easier this would become, and as a result, the requirement that employers participate in the interactive process would be toothless. Thus, where there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded. Cf. Hendrick–Robinson v. Excel Corp., 154 F.3d 685 (7th Cir. 1998)(Refusing to grant an employer summary judgment because it may not have participated in good faith in finding accommodations); Baert v. Euclid Beverage, Ltd., 149 F.3d 626 (7th Cir. 1998)(Refusing to grant an employer summary judgment because disputes of fact remained about which party caused the breakdown in the interactive process).9 When the disability involved is one that is heavily

_____

9. The Ninth Circuit has expressed disagreement with our decision in Mengine and concluded that employers are not obliged to participate in the interactive process. See Barnett v. U.S. Air, Inc., 157 F.3d 744, 753 (9th Cir. 1998). The majority in Barnett worried that an employer could be held liable for failing to engage in the interactive process even though the employee was successfully accommodated. We believe that where an employer has successfully made reasonable accommodations, a court can conclude as a matter of law that the employer did not act in bad faith. The Barnett majority also objected that it was not clear when an

stigmatized in our society – as is true when the employee is voluntarily or involuntarily committed to a mental institution – courts should be especially wary on summary judgment of underestimating how well an employee might perform with accommodations or how much the employer's bad faith may have hindered the process of finding accommodations.

In Taylor's case we believe that there are genuine disputes about the school district's good faith participation in the interactive process, and assuming the school district did act in bad faith, nothing the school district points to demonstrates that it would be impossible to accommodate Taylor. Prior to her hospitalization, Taylor performed her job effectively for nearly two decades. But after becoming disabled and seeking accommodations, she has presented evidence that the school district made no response to her request and instead increased the difficulty of her job. Given the evidence Taylor presents of bad faith on the school district's part, we will not decide on summary judgment that it would have been fruitless for the school district to make some modest and fairly obvious efforts to accommodate.

_____

employer would incur process liability. Bad faith can, of course, take many different forms, just as negligence can, precluding easy statement of a general rule about when bad faith has occurred. However, we believe that jurors should be able to distinguish between stonewalling and assisting an employee in finding accommodations. The fact that there may be some hard cases is hardly unique in law. The Barnett majority's last objection was that 29 C.F.R. S 1630(o)(3) only states that it "may be necessary" for the employer to engage in an interactive process. But the EEOC's interpretive guidelines state that once an employee requests accommodations, the employer "must make a reasonable effort to determine the appropriate accommodation." 29 C.F.R. Pt. 1630, App. S 1630.9 at 359. The guidelines continue that in some instances the interactive process may not be necessary because it is clear to both parties involved what accommodation will work. For example, the guidelines explain that an employee in a wheelchair may want her desk elevated with blocks so that her wheelchair will slide under. No interactive process will be needed here. Id. at 360. The regulation uses the phrase "may be necessary," in other words, because sometimes the necessary accommodation is obvious. We have also recognized that the process is not necessary in cases where accommodation is impossible.

32

In particular, the school district could have increased Taylor's job responsibilities more slowly, given more time to introduce the computer, or communicated less by formal, written reprimands. The EEOC compliance manual for psychiatric disorders provides that some adjustments in supervisory methods can qualify as legitimate accommodations.[10] The ADA itself specifically provides that reasonable accommodations can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. S 12111(9)(B).

The fact that Taylor's potential accommodations are modest should not encourage us to dismiss Taylor's claim on summary judgment on the theory that they would be useless; that would have the bizarre implication that the more demanding a plaintiff's accommodations were, the more likely the plaintiff is to survive summary judgment. Plaintiffs who wish to participate in good faith in the interactive process are more likely to have scaled back their demands and asked for modest accommodations. More importantly, we think it is worth remembering that sometimes comparatively modest accommodations can reap large returns in how well a disabled employee performs.

_____

10. The EEOC compliance manual states that: "Supervisors play a central role in achieving effective reasonable accommodations for their employees. In some circumstances, supervisors may be able to adjust their methods as a reasonable accommodation by, for example, communicating assignments, instructions, or training by the medium that is most effective for a particular individual (e.g., in writing, in conversation, or by electronic mail)." 2 EEOC Compliance Manual, Enforcement Guidance for Psychiatric Disabilities, at 26. However, the manual continues that "[r]easonable accommodation... does not require lowering standards or removing essential functions of the job." Id. at 26 n.62. We would hasten to add that a disabled employee is not entitled to a supervisor ideally suited to his or her needs. We held in Gaul, for instance, that an employee is not entitled to transfer whenever the employee deems that his co-workers are causing him inordinate stress. 134 F.3d at 579.

We want to reiterate the limits of the interactive process. We are not holding that an employer who has made a good faith effort to accommodate must be saddled with a secretary who consistently makes typos and fails to deliver messages. Nor do we hold that an employer cannot introduce a new computer system or switch an employee to a less forgiving supervisor. What we do hold is that an employer, having received adequate notice of an employee's disability and desire for accommodations, cannot fail to engage the employee in the interactive process offinding accommodations, increase the disabled employee's job responsibilities, and then simply document the employee's failures.

To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith. Mengine, 114 F.3d at 420; Bultemeyer, 100 F.3d at 1285; Taylor, 93 F.3d at 165.

We believe that a reasonable jury could conclude that Taylor requested accommodations, that the school district made no effort to help Taylor find accommodations and was responsible for the breakdown in the process, and that there were accommodations that the school district could have provided that would have made Taylor able to perform the essential functions of her job. If a jury concludes that the school district was not responsible for the breakdown in the interactive process, Taylor must demonstrate that a specific, reasonable accommodation would have allowed her to perform the essential functions of her job.

We have viewed the evidence in the light most favorable to Taylor, as we must on summary judgment. The school district is, of course, free to argue at trial that it did not receive notice of Taylor's request for accommodation, that it tried to assist Taylor in seeking accommodations, or, assuming the school district was responsible for the breakdown in the process, that no accommodation would

34

have allowed Taylor to perform the essential functions of her job. And as we discussed in an earlier section above, the school district can also contest whether Taylor is disabled while on medication.11

IV

For the foregoing reasons, we will reverse the March 20, 1998 grant of summary judgment by the District Court and remand the case for further proceedings. By a separate order we have granted panel rehearing and vacated our prior opinion, which was reported at 174 F.3d 142.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

_____

11. The District Court treated Taylor's complaint as possibly raising a disparate-treatment claim. Because Taylor represents on appeal that she did not intend to raise such a claim, we need not reach the issue.

35