CANTEEN CORPORATION, Division of Compass Group, Petitioner,

v.

PENNSYLVANIA HUMAN RELATIONS COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Dec. 3, 2002.
Decided Jan. 2, 2003.

---

5. *See Lupton,* 533 S.E.2d at 273.

Thomas P. Dowd, Washington, DC, for petitioner.

Charles L. Nier, III, Philadelphia, for respondent.

Geoffrey R. Johnson, Philadelphia, for intervenor, S. Weber.

Before PELLEGRINI, J., LEAVITT, J., and FLAHERTY, Senior Judge.

OPINION BY Judge PELLEGRINI.

Canteen Corporation (Canteen) petitions for review from an order of the Pennsylvania Human Relations Commission (Commission) finding that Canteen violated Section 5(a) of the Pennsylvania Human Relations Act (Act),[1] 43 P.S. § 955(a), by unlawfully discriminating against Sophie Weber (Weber) when it failed to reasonably accommodate her disability.

The facts of this case are not in dispute. In 1985, Weber began working for Canteen, a Philadelphia based vending services supplier, as an accounting clerk. As an accounting clerk, Weber's job required her to file stacks of documents, carry folders and envelopes weighing up to five pounds, and transfer files from cabinets into boxes. In performing these tasks, Weber would frequently have to do lifting and bending.

In 1987, Weber suffered a back injury that required surgery and a five-month medical absence from work. Upon her return to work, she brought a doctor's note stating that she should refrain from lifting any object weighing 25 pounds or more. Because her tasks as an accounting clerk did not require any heavy lifting, Weber was able to continue performing her job as she had prior to her injury.

In 1999, Canteen sought to cross-train some of its employees to assist in the "coin room" as a relief person.[2] The relief person would be responsible for lifting bags of coins weighing up to 20 pounds all day long. Because Weber's duties as an accounting clerk could easily be performed by other employees, she was one of the first employees selected for cross-training. Upon learning that she was to be cross-trained in the "coin room," Weber expressed concern about the lifting requirements to Tom Britten (Britten), the General Manager of the Philadelphia Canteen facility. Britten checked Weber's personnel file and found the 1987 doctor's note. Because the doctor's note only prohibited lifting more than 25 pounds and would not prevent Weber from working in the "coin room," Canteen told Weber that she would need an updated doctor's note stating that she could not perform the "coin room" responsibilities, mainly lifting bags weighing 20 pounds.

In response to that request, Weber returned with a note from David A. Cautilli,

1. Act of October 27, 1955, P.L. 744, *as amended,* 43 P.S. §§ 951–963. Section 5(a) of the Act provides in relevant part that:

It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification, or in the case of a fraternal corporation or association, unless based upon membership in such association or corporation, or except where based upon applicable security regulations established by the United States or the Commonwealth of Pennsylvania:

(a) For any employer because of the race, color, religious creed, ancestry, age, sex, national origin or non-job related handicap or disability or the use of a guide or support animal because of the blindness, deafness or physical handicap of any individual or independent contractor, to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual

or independent contractor, or to otherwise discriminate against such individual or independent contractor with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual or independent contractor is the best able and most competent to perform the services required.

2. The "coin room" was the location where employees came at the beginning and end of their shift to receive and return coins that were used in vending machines. The "coin room" was staffed by two employees, the lead cashier and the relief person. Both employees were responsible for distributing and counting coins; however, the lead cashier was, at times, needed to lift bags of coins weighing up to 50 pounds, whereas the relief person only was responsible for lifting bags weighing up to 20 pounds.

M.D. (Dr. Cautilli), an orthopedic surgeon, with a note stating:

DX: Lumbar spondylosis

This patient is to be doing a permanent restriction of sedentary type work, and she should avoid any lifting or bending activites (sic), secondary previous disc herniation and significant arthritis in her lumbar spine.

When Weber gave the note to Britten, he discussed it with other members of the management, including Steve Gaber (Gaber), Canteen's Human Resources Director. Because of concerns Gaber had regarding the scope of the work restriction in the note, he set up a conference call with Weber, Britten and two others. Gaber read the note over the phone and emphasized that it stated that Weber could not do any lifting or bending, including lifting a pencil or picking up a piece of paper. He also asked Weber if her current job as an accounting clerk required her to do any lifting or bending, which she acknowledged it did. During the conference call, Gaber did most of the talking while Weber merely listened. The conference call lasted five to ten minutes and was the only discussion between Weber and Canteen's management regarding her disability and job status.

Following the conference call, Gaber and Britten made the decision that Weber could not continue working as an accounting clerk because that position required lifting and bending. The next day, Weber arrived at work and was informed by Britten that she would be paid for that day, but that she could not continue working because Canteen did not have any job she could perform safely.

A few days later, Canteen sent Weber short-term disability and family medical leave forms. She returned the uncompleted family medical leave form having written on it, "Employer (Canteen Corp.) has told me I am disabled even though I am capable of performing my job as set forth in my job description. I did not quit my job on 3/1/99. I was terminated." She also attached to the form a new doctor's certification from Dr. Cautilli. On the certification, Dr. Cautilli wrote that he considered Weber able to accept immediate employment, but that she should avoid repeated lifting and bending. Canteen concluded that the new certification from Dr. Cautilli did not change Weber's status with the company. Canteen's records indicated that as of April 23, 1999, Weber was officially terminated for a medical reason. At the time of her termination, Weber earned $11.35 per hour and worked a 40-hour week.

Following her termination, Weber looked for work in Northeast Philadelphia where Canteen was located. She limited her job search to Northeast Philadelphia because she was uncomfortable traveling into downtown Philadelphia, despite the possibility of car-pooling with her husband who worked in that area. She regularly checked two local newspapers, The Northeast Times and the News Gleaer [sic], and sent out approximately ten resumes. She felt that her chances of finding a job were minimal because she was now over 60 years old. After about six months of job searching, Weber began performing volunteer work at a local bookstore.

On March 3, 1999, Weber filed a complaint with the Commission alleging that she was terminated because of her age and disability status. The Commission dismissed Weber's age discrimination claim, but issued a Finding of Probable Cause with respect to the disability discrimination claim and the case was assigned to a Permanent Hearing Examiner. Based on the report by the Permanent Hearing Examiner, the Commission found that Canteen had engaged in disability discrimina-

tion by failing to engage in a good faith interactive process to reasonably accommodate her disability. It ordered Canteen to pay Weber six months back-pay plus prejudgment interest, and to offer her the next available position as an accounting clerk or an equivalent position. This appeal followed.[3]

Canteen contends that the Commission erred in finding that it had engaged in disability discrimination because: (1) Weber's discrimination claim should have been analyzed under the *McDonnell Douglas* burden-shifting test, not under a reasonable accommodation analysis; (2) Canteen was not responsible for the breakdown in the interactive process; (3) Canteen relied upon a medical opinion in determining that Weber could not perform the essential functions of her job; and (4) Weber failed to mitigate her damages.

## I.

Canteen contends that the Commission applied the incorrect burden of proof when it found that Canteen had illegally discriminated against Weber. It argues that the Commission should have applied the test, at least the burden-shifting part, set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), which our Supreme Court, in *General Electric Corp. v. Pennsylvania Human Relations Commission*, 469 Pa. 292, 365 A.2d 649 (1976), adopted as applying to discrimination claims under the Act. In saying a burden-shifting test applies, Canteen contends that the initial

burden was on Weber to establish that there was no reasonable accommodation, that she has not met her initial burden, and that the burden never shifted to it.

The *McDonnell Douglas* test is a burden-shifting test to establish discrimination, not to establish whether an employer has provided a reasonable accommodation for a disability. The *McDonnell Douglas* test is applicable in situations where an employee has no direct proof of discrimination and he or she must satisfy the *McDonnell Douglas* burden-shifting method to prove indirectly that his or her employer discriminated against him or her due to his or her disability. *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281 (7th Cir.1996). It sets forth a four-prong test that an employee trying to establish a case of discrimination under the Americans with Disabilities Act of 1990(ADA), 42 U.S.C. §§ 12101–12213, as well as other federal discrimination laws, must meet in order to shift the burden to the employer that it did not engage in unlawful employment discrimination requiring an employee to show that he or she (1) belongs to a protected minority; (2) applied and was qualified for a job for which the employer was seeking applicants; (3) was rejected despite being qualified for the position; and (4) after the rejection, the position remained open and the employer continued to seek applicants from person of complainant's qualifications.[4] *McDonnell*, 411 U.S. at 802, 93 S.Ct. 1817. Once the employee has demonstrated he or she satisfies the *McDon-*

---

3. This Court's review of a determination of the Commission is limited to whether there was a violation of constitutional rights, an error of law, or whether the findings of fact necessary to support the determination are supported by substantial evidence. *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 127 Pa.Cmwlth. 436, 561 A.2d 1320 (1989).

4. The *McDonnell Douglas* burden-shifting test can also be adjusted and applied accordingly to situations where a complainant was terminated from a job. *Allegheny Housing Rehabilitation Corporation v. Pennsylvania Human Relations Commission*, 516 Pa. 124, 532 A.2d 315 (1987).

*nell Douglas* test, the burden would then shift to the employer to proffer a non-discriminatory reason for the employee's termination. Where the employee has direct proof of discrimination, the *McDonnell Douglas* test is not applicable because there would be no need to shift the burden. *Bultemeyer*, 100 F.3d at 1283. In this case, it is undisputed that Weber was terminated due to her disability, making the *McDonnell Douglas* burden-shifting test inappropriate.

■ The test Canteen laid out, to which it wants to apply the *McDonnell Douglas* burden-shifting aspect, is the burden of proof that federal courts have stated that an employee must meet in order to establish that he or she was unlawfully discriminated against because of the failure of an employer to make a reasonable accommodation. It requires an employee to establish: (1) that he or she is a disabled person within the meaning of the Act; (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she has suffered an otherwise adverse employment decision as a result of discrimination. Unlike the *McDonnell Douglas* test, though, this test is not a burden-shifting test; instead, it sets forth what an employee

needs to establish to make out a prima facie case under the ADA. *See Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir.1999); *Gaul v. Lucent Technologies*, 134 F.3d 576 (3d Cir.1998). This prima facie case as set forth by the federal courts was, in essence, the test denominated by the Commission as the "reasonable accommodation analysis" and used by it to determine if Weber met her burden of proving unlawful discrimination.

■ Although we have never addressed whether this is the proper test applicable to an analysis under the Act,[5] we agree that it is the proper one. Section 5(a) of the Act declares it to be unlawful for an employer to discriminate against any employee based on a non-job related handicap or disability, if the employee is the most competent to perform the services required. 43 P.S. § 955(a). Section 9(f)(1) of the Act requires employers who have discriminated based on a disability to take such affirmative action, including the making of reasonable accommodations. 43 P.S. § 959(f)(1). Furthermore, the Commission's regulations supplementing the Act state that an employer cannot discriminate against a disabled employee where a reasonable accommodation is possible unless it would impose an undue hardship on the employer.[6] 16 Pa.Code § 44.5(b). Be-

---

**5.** In interpreting the provisions of the Act, we are not bound by federal court decisions interpreting the similar or identical federal provisions contained in various federal civil rights acts. *City of Pittsburgh Commission on Human Relations v. DeFelice*, 782 A.2d 586 (Pa.Cmwlth.2001). *See, e.g., Harrisburg School District v. Pennsylvania Human Relations Commission*, 77 Pa.Cmwlth. 594, 466 A.2d 760 (1983); *Anderson v. Upper Bucks County Area Vocational Technical School*, 30 Pa.Cmwlth. 103, 373 A.2d 126 (1977). However, in a case of first impression, it is appropriate to look to federal decisions involving similar federal statutes for guidance. *DeFelice. See, e.g., Imler v. Hollidaysburg American Legion Ambulance Service*, 731 A.2d 169

(Pa.Super.), *petition for allowance of appeal denied*, 560 Pa. 706, 743 A.2d 920 (1999); *Commonwealth of Pennsylvania v. Pennsylvania Labor Relations Board*, 107 Pa.Cmwlth. 132, 527 A.2d 1097 (1987).

**6.** 16 Pa.Code § 44.5(b) provides in relevant part:

(b) Handicapped or disabled persons may not be denied the opportunity to use, enjoy or benefit from employment and public accommodations subject to the coverage of the act, where the basis for the denial is the need for reasonable accommodations, unless the making of reasonable accommodations would impose an undue hardship.

cause the standard enunciated by the federal courts establishes a direct violation of the Act for failing to provide a reasonable accommodation for an employee's disability, the "reasonable accommodation analysis" is the proper standard to be applied to determine whether an employer has engaged in disability discrimination.

In this case, there is no argument that Weber is a disabled person within the meaning of the Act and that she has suffered an adverse employment decision, thereby meeting the first and third prong needed to make out her prima facie case. It is the second prong of the prima facie case that Canteen contends was not satisfied. It argues that because Weber cannot do any lifting or bending, she is not qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; therefore, she has not made out a claim for unlawful disability discrimination. In essence, we are being asked to decide what duty an employer has in determining if a reason-

able accommodation for a disabled employee is possible.

■■■ Because we have adopted the federal burden of proof standard, federal regulations can offer us some pertinent guidance. Under those regulations, to determine an appropriate reasonable accommodation, the employer may need to initiate an informal, interactive process to ascertain the most reasonable solution. 29 C.F.R. § 1630.2(o)(3).[7] The regulations also offer additional guidance regarding the scope and definition of the interactive process, describing it as a step-by-step process. 29 C.F.R. § 1630 Appendix.[8] In summation, once an employee asks for a reasonable accommodation due to a disability, the employer has an obligation to initiate an interactive process with him or her aimed at determining the disabled employee's limitations and any possible way of accommodating them.

■■■ Canteen contends that it could not have initiated the interactive process

---

**7.** 29 C.F.R. § 1630.2(o)(3) states in relevant part:

To determine the appropriate reasonable accommodation it may be necessary for [an employer] to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

**8.** 29 C.F.R. § 1630 Appendix provides in relevant part:

... the employer must make a reason ... the employer must make a reasonable effort to determine the appropriate accommodation. The appropriate reasonable accommodation is best determined through a flexible, interactive process that involves both the employer and the qualified individual with a disability ... When a qualified individual with a disability has requested a reasonable accommodation to assist in the performance of a job, the employer, using

problem solving approach should [analyze the essential functions of the job and consult with the employee to determine an appropriate reasonable accommodation].
[I]n some instances neither the individual requesting the accommodation nor the employer can readily identify the appropriate accommodation. For example, the individual needing the accommodation may not know enough about the equipment used by the employer or the exact nature of the work site to suggest an appropriate accommodation. Likewise, the employer may not know enough about the individual's disability or the limitations that disability would impose on the performance of the job to suggest an appropriate accommodation. Under such circumstances, it may be necessary for the employer to initiate a more defined problem solving process, such as the step-by-step process described above, as part of its reasonable effort to identify the appropriate reasonable accommodation.

because Weber did not specifically request a reasonable accommodation. In requesting an accommodation, an employee may use "plain English" and need not mention the phrase "reasonable accommodation." *Taylor*, 184 F.3d at 313; *see also Bultemeyer*, 100 F.3d at 1285–86. All that is necessary to request a reasonable accommodation is that the disabled employee makes clear his or her want of assistance or accommodation. The Commission determined, and we agree, that Weber requested a reasonable accommodation when she expressed concern with the lifting requirements of the "coin room." Canteen knew of Weber's disability and her concern over her ability to perform a job that required the repeated lifting of 20 pound bags, a dramatic increase in the weight and frequency of any lifting activities she had been performing.

Once Weber informed Canteen of her need for a reasonable accommodation, as the Commission found she did, it then had the obligation to initiate an interactive process to determine whether she may have been able to perform the essential functions of her job with reasonable accommodation.[9] It is within this interactive process that a court must isolate the cause of the breakdown and then assign responsibility. *Bultemeyer*, 100 F.3d at 1284. In assigning responsibility for a breakdown in the interactive process, "courts should look for signs of failure to participate in good faith or failure by one of the parties to help the other party determine what specific accommodations are necessary." *Taylor*, 184 F.3d at 312. The *Taylor* court went on to note that, "[o]nce the employer knows of the disability and the employee's desire for accommodations, it makes sense to place the burden on the employer to request additional information that the employer believes it needs." *Id.* at 315. The court stated:

> [t]he interactive process, as its name implies, requires the employer to take some initiative ... The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome. That's not the proactive process intended: it does not help avoid litigation by bringing the parties to a negotiated settlement, and it unfairly exploits the employee's comparative lack of information about what accommodations the employer might allow.

*Id.* at 315–16. Because Canteen did not engage in the interactive process, Weber never had a chance to demonstrate that she may have been able to perform the essential functions of her job with a reasonable accommodation.

In response, Canteen argues that the interactive process would have been useless because Weber's limitation of no lifting or bending precluded the finding of any reasonable accommodation because

---

9. The federal regulations provide an example of the interactive process envisioned under the ADA. Curiously, the example describes a situation where an employee with a back problem is required to pick up and carry 50–pound sacks on a loading dock. The example explains that once the employee asks for a reasonable accommodation, the employer must determine the essential function of the job, meet with the employee regarding his or her limitations and develop, with the input of the employee, a reasonable accommodation. In this example, the regulations describe the essential functions of the job, not as lifting and carrying, but as moving the bags from one spot to another. The example concludes with the determination that the bags can be moved by other means, such as a dolly, cart or hand truck.

the essential functions of an accounting clerk requires lifting and bending. We disagree. First, Canteen's only discussion with Weber regarding her disability, who had worked for the company for 14 years, lasted for five to ten minutes, and Weber mostly sat there and listened. Canteen made no attempt to further elicit information about her disability, contact her doctor or send her to its own doctor to establish if she could continue to perform her current position which only required her to lift up to five pounds. Second, Weber had supplied Canteen with a second physician's certification stating that she was capable of being employed and performing some lifting and bending, as long as it was not repeated, but again, Canteen made no effort to contact her physician. Third, Weber's essential job functions did not include lifting and bending—these activities were only the means to an end. Finally, it is possible that through the interactive process, the two parties could have come to a resolution that would have enabled Weber to accomplish her tasks without repeated lifting and bending, such as a dolly or hand cart. In the end, Canteen and Weber may have discovered that no reasonable accommodation was possible; however, if the interactive process is never initiated, a potential resolution may never be determined. Because Canteen failed to engage Weber in an interactive process, it was responsible for the breakdown of that process.

## II.

Canteen contends that it did not discriminate against Weber because it relied upon the opinion of a medical expert in determining whether she could perform the essential functions of her job. In supporting its argument, Canteen cites to this Court's opinions in *Action Industries, Incorporated v. Pennsylvania Human Relations Commission*, 102 Pa.Cmwlth. 382, 518 A.2d 610 (1986) and *Pennsylvania State Police v. Pennsylvania Human Relations Commission*, 72 Pa.Cmwlth. 520, 457 A.2d 584 (1983), where we concluded that an employer could not be accused of unlawful discrimination if the employer reasonably relied upon the opinion of its medical expert in reaching its decision not to hire an individual. However, *Action* and *State Police* do not stand for the proposition that by relying on their doctors' recommendation, an employer is insulated from a claim of disability discrimination. ("This is not to say that in cases involving handicap discrimination an employer can always insulate itself by having a physician "sign off" on all hiring decisions." *Action*, 518 A.2d at 613.)

Unlike the medical opinions in *Action* and *State Police*, Dr. Cautilli stated in his physician's certification that Weber could continue to be employed, albeit with restrictions. This recommendation for employment placed a burden on Canteen to engage Weber in an interactive process to determine what her limitations were and whether they could be reasonably accommodated. Canteen cannot claim it relied on the recommendation that repeated lifting and bending had to be avoided, while at the same time ignore the recommendation that Weber was able to continue working. Furthermore, the phrase "repeated lifting and bending" is vague; it is the purpose of the interactive process to further define and understand these types of limitations. Because the physician's certification recommended Weber for continued employment, Canteen cannot rely on the limitations set forth therein in terminating her.

## III.

Finally, Canteen contends that the Commission erred in finding that Weber

properly mitigated her damages. Canteen argues that Weber failed to exercise reasonable diligence and good faith in seeking alternative employment by limiting her search to the Northeast Philadelphia area and by only sending out ten resumes.

The burden of mitigation imposed on a complainant is not onerous and does not require success. *Brooks v. Woodline Motor Freight, Incorporated*, 852 F.2d 1061 (8th Cir.1988). All that is required is an honest, good faith effort. *Id.* The Permanent Hearing Examiner took administrative notice of the vast area covered by Northeast Philadelphia. In addition, the Permanent Hearing Examiner determined that because Canteen's facility was located in that region, it was reasonable for someone to look for a job in the location of his or her previous employment. Furthermore, it was within the Permanent Hearing Examiner's discretion in listening and crediting the testimony of both parties to determine whether the sending of ten resumes was sufficient. The existence of substantial evidence on the record supports the Commission's determination of back pay and interest and will not be disturbed by this Court.

Accordingly, the decision of the Commission is affirmed.

### ORDER

AND NOW, this *2nd* day of *January,* 2003, the order of the Pennsylvania Human Relations Commission, No. E 90886AH, dated April 22, 2002, is affirmed.