# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pennsylvania Public Utility Commission, | : | |
| | : | |
| Petitioner | : | |
| | : | No. 382 C.D. 2025 |
| v. | : | |
| | : | Argued: December 8, 2025 |
| Pennsylvania Human Relations Commission, | : | |
| | : | |
| Respondent | : | |

BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
HONORABLE LORI A. DUMAS, Judge
HONORABLE MATTHEW S. WOLF, Judge

## *OPINION NOT REPORTED*

**MEMORANDUM OPINION BY**
**JUDGE DUMAS**                                    **FILED:  January 9, 2026**

Petitioner Pennsylvania Public Utility Commission (PUC) petitions for review of the final order entered by Respondent Pennsylvania Human Relations Commission (HRC) on February 24, 2025.  Therein, the HRC ruled that the PUC had violated Section 5(a) of the Pennsylvania Human Relations Act (Act)[1] through its handling of a request made by River Robbins (Robbins), a now-former PUC employee, that she be permitted to work from home on a full-time, permanent basis. Upon review, we are constrained to affirm, on the basis that the record supports the HRC's determination that in-office work was not an essential function of Robbins' position.

---

[1] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. § 955(a).

# I. BACKGROUND[2]

Robbins has been diagnosed as suffering from anorexia, anxiety, attention deficit hyperactivity disorder, autism, and post-traumatic stress disorder. As a result, she has great difficulty in large environments and social settings, as well as hypersensitivity to light, smells, and sounds. In her personal life, she tries to mitigate the effects of these issues by limiting the amount of time she spends in public, as well as by wearing items like earbuds, hats, and sunglasses.

On July 15, 2019, Robbins was hired by the PUC for the position of Clerk Typist 2, which required Robbins to work in-person five days per week at PUC's offices in Harrisburg. Robbins complied with this requirement, albeit not without difficulty. According to Robbins, coming into the office each day caused her great anxiety, often led to "meltdowns," and negatively affected her sleeping and eating habits.

On March 16, 2020, the PUC responded to the exigencies of the COVID-19 pandemic by ordering all of its employees to begin working from home. Robbins then teleworked from her residence on a full-time basis, using a PUC-issued laptop to perform her job duties. As time passed, Robbins found this transition from in-office to remote work had caused her job-related mental and physical issues to greatly improve or to go away completely. The PUC subsequently promoted Robbins to Compliance Specialist I on May 17, 2021, at which point the PUC's work-from-home policy was still in place.

---

[2] We draw the bulk of this section's substance from the Findings of Fact (F.F.), Conclusions of Law (C.L.), and Opinion that were drafted by an HRC Permanent Hearing Examiner (Examiner) and were adopted in full by the HRC, as well as the HRC's subsequent Final Order. *See generally*, HRC's F.F., C.L., and Op.; HRC's Final Ord., 2/24/25.

Eventually, Robbins heard that the PUC was going to require its employees to return to in-person work and responded by sending an email to the PUC's Human Resources department on August 2, 2022. Through this email, Robbins requested that the PUC grant her a disability accommodation that would allow her to continue working remotely on a full-time basis. Human Resources responded by sending her the relevant accommodation request paperwork, while also informing Robbins that any such request would be premature, because the PUC had not formally made any changes to its telework policy at that point.

On September 15, 2022, the PUC formally notified its employees that they would be required to return to in-person work as of October 2, 2022, and would consequently have to spend two days in the office each week. Robbins responded to this change by formally filing her accommodation request paperwork that same day. The PUC then sought and received information from Alexis Henry, CRNP, (Henry) Robbins' healthcare provider. Henry did not believe that the proposed accommodations suggested by the PUC, including providing ear buds, headphones, or sunglasses; eliminating certain scents and smells; and allowing for scheduled breaks, were sufficient to address Robbins' issues and instead recommended that Robbins be allowed to remain as a full-time remote worker. Robbins' request remained unresolved as of October 2, 2022, so she began taking sick leave each day that she was expected to be in the office. On October 13, 2022, the PUC denied the request, on the basis that working in person was an essential function of Robbins' position. Thereafter, the PUC denied Robbins' request for reconsideration, as well her subsequent request for permission to telework for an additional 90 days. The PUC then placed Robbins on continuous unpaid leave pursuant to the Family

Medical Leave Act of 1993 (FMLA)[3] on November 2, 2022, and locked Robbins out of her PUC work accounts. In the letter notifying Robbins about the FMLA placement, the PUC informed her that she would be able to return to the PUC once her doctor cleared her to perform her job's essential functions, including in-office work.

Robbins responded by taking several additional actions over the ensuing months. On November 2, 2022, Robbins filed a complaint against the PUC with the HRC. Next, Robbins informed the PUC on November 7, 2022, that she would be forced to eventually resign if she was required to stay on continuous FMLA leave. The PUC did not subsequently provide Robbins with her desired accommodation or remove her from continuous leave; this state of affairs eventually prompted Robbins to resign on January 12, 2023. Robbins then filed an amended complaint with the HRC, in which she alleged that the PUC had violated Section 5(a) of the Act by both failing to provide her with a reasonable accommodation and by constructively discharging her.

The HRC reviewed Robbins' amended complaint and then issued a finding of probable cause. The matter was then assigned to the Examiner, who held hearings on October 16 and 17, 2024. The Examiner subsequently issued proposed findings of fact, conclusions of law, and an opinion, collectively through which the Examiner concluded that Robbins had proven that the PUC had discriminated against her in violation of Section 5(a) of the Act and recommended that Robbins be awarded back pay, front pay, and interest. The HRC then issued its Final Order on February 24, 2025, through which it fully adopted the Examiner's findings of fact,

---

[3] 29 U.S.C. §§ 2601; 2611-2620; 2631-2636; 2651-2654.

4

conclusions of law, and opinion. The PUC then filed its petition for review with our Court shortly thereafter.

## II. DISCUSSION[4]

Generally speaking, "the PHRA provides protection to one dismissed from employment because of a 'non-job related handicap,' 43 P.S. § 955[(a)], which means a handicap or disability 'which does not substantially interfere with the ability to perform the essential functions' of the individual's employment. 43 P.S. § 954(p)." *Trowbridge v. Scranton Artificial Limb Co.*, 747 A.2d 862, 865 (Pa. 2000). In order to successfully pursue a claim against an employer pursuant to Section 5(a) of the PHRA, an employee must satisfy three prerequisites. First, the employee must establish "that he or she is a disabled person within the meaning of the [PHRA.]" *Canteen Corp. v. Pa. Hum. Rels. Comm'n*, 814 A.2d 805, 811 (Pa. Cmwlth. 2003). Second, they must show "that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer[.]" *Id.* Finally, they must prove "that he or she has suffered an otherwise adverse employment decision as a result of discrimination." *Id.*[5]

---

[4] We review the HRC's adjudications to determine whether the HRC violated constitutional rights, committed errors of law, or made factual findings unsupported by substantial evidence. The Commission is the sole fact finder in civil service cases and has exclusive authority to assess witness credibility and to resolve evidentiary conflicts. In evaluating whether the HRC committed an error of law, our standard of review is *de novo* and our scope of review is plenary. In other words, we do not defer to the HRC's conclusions of law, and we reassess the record with a fresh pair of eyes.

*Allegheny Cnty. Dep't of Health v. Wilkerson*, 329 A.3d 111, 117 (Pa. Cmwlth. 2024) (cleaned up).

[5] This three-prong test was originally established in federal court for purposes of determining whether an individual had established a *prima facie* valid employment discrimination claim

5

The PUC does not dispute that Robbins met the first prong's disability requirement; rather, it insists that the HRC abused its discretion and committed errors of law by ruling that she had satisfied the remaining two prongs of the test. PUC's Br. at 12. Specifically, the PUC asserts that the HRC incorrectly determined that (a) in-person work was not an essential function of Robbins' job; (b) Robbins' request that she be allowed to work remotely on a full-time, permanent basis was reasonable; (c) Robbins fully participated, and acted in good faith, during efforts to settle upon a reasonable accommodation that would be acceptable to both her and the PUC; and (d) the PUC constructively discharged Robbins from her position through its handling of her accommodation request. *Id.* at 12-22. We address each of these arguments in turn.

The PUC's first argument hinges upon what constitutes an "essential function" of the Compliance Specialist position. This phrase is not expressly defined in either the PHRA itself or the attendant administrative regulations that have been promulgated by the HRC. However, the federal Equal Employment Opportunity Commission (EEOC) has explicated the term's meaning through its ADA-based administrative regulations.[6] Specifically, the EEOC has stated that "essential functions" are "the fundamental job duties of the employment position the individual

---

pursuant to the Americans with Disabilities Act of 1990 (ADA), 42 U.S.C. §§ 12101-12213. *Canteen*, 814 A.2d at 311 (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296 (3d Cir. 1999), and *Gaul v. Lucent Tech.*, 134 F.3d 576 (3d Cir. 1998)). "Generally, [the] PHRA and the ADA are interpreted in a co-extensive manner because both laws deal with similar subject matter and are grounded on similar legislative goals." *Harrisburg Area Cmty. Coll. v. Pa. Hum. Rels. Comm'n*, 245 A.3d 283, 293 n.10 (Pa. Cmwlth. 2020). Though federal courts' interpretations of the ADA do not compel Pennsylvania courts to interpret analogous PHRA provisions in the same way, we may nevertheless turn to such federal case law for use as persuasive authority. *Id.*

[6] "Because we have adopted the federal burden of proof standard, federal regulations can offer us some pertinent guidance." *Canteen*, 814 A.2d at 812.

with a disability holds or desires[,] . . . not . . . the marginal functions of the position."

29 C.F.R. § 1630.2(n)(1). Furthermore, according to the EEOC's regulations:

> A job function may be considered essential for any of several reasons, including but not limited to the following:
>
>> (i) The function may be essential because the reason the position exists is to perform that function;
>>
>> (ii) The function may be essential because of the limited number of employees available among whom the performance of that job function can be distributed; and/or
>>
>> (iii) The function may be highly specialized so that the incumbent in the position is hired for his or her expertise or ability to perform the particular function.

*Id.* § 1630.2(n)(2).[7]

When distilled to its essence, the PUC's assertion that in-office work was an essential function of Robbins' position is based upon several linked lines of reasoning. First, PUC management had conducted a thorough assessment of the Compliance Specialist position in 2022 and had determined that, post-pandemic, it was essential that those employees with that organizational role be physically

---

[7] The EEOC has also provided a non-exhaustive list of evidence that can be used to determine whether a certain job function is essential:

>> (i) The employer's judgment as to which functions are essential;
>>
>> (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
>>
>> (iii) The amount of time spent on the job performing the function;
>>
>> (iv) The consequences of not requiring the incumbent to perform the function;
>>
>> (v) The terms of a collective bargaining agreement;
>>
>> (vi) The work experience of past incumbents in the job; and/or
>>
>> (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3).

present in the office two days per week. PUC's Br. at 13-14. Second, the Compliance Specialist position is not one that was ever intended to be remote in nature, as all of the relevant PUC documentation (including the official job description, the agreement that allowed telework during the pandemic, and the formal plan for such employees to return to the office) show that in-office work was an essential function of that job. *Id.* at 14-17. Third, Compliance Specialists are tasked with observing hearings and also with presenting materials at legislative meetings, neither of which can be done remotely. *Id.* at 14. Fourth, some PUC files are not in electronic format, and it imposes a burden upon other PUC employees to scan such physical files and transmit them to remote workers. *Id.* at 5; PUC's Reply Br. at 3-4. Finally, Compliance Specialists were required to occasionally report to the office during the pandemic, in order to process mail. PUC's Br. at 5; PUC's Reply Br. at 3.

In support of its first argument, the PUC claims that "the judicial inquiry into what functions are essential for a position is not intended to second guess an employer's business judgment." PUC's Br. at 13 (citing *Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 148 (3d Cir. 1998)). This assertion is not an entirely accurate recitation of the law. Instead, the question of "[w]hether a particular function is essential is a factual determination that must be made on a case by case basis. In determining whether or not a particular function is essential, all relevant evidence should be considered." 29 C.F.R. pt. 1630, app. § 1630.2(n). An employer's position regarding a job's putatively essential functions and the formal description of that job "are two *possible* types of evidence for determining the essential functions of a position, but . . . such evidence is not to be given greater weight simply because it is included in the non-exclusive list set out in 29 C.F.R. § 1630.2(n)(3)." *Deane*,

8

142 F.3d at 148 (emphasis in original). In other words, such evidence must not be interpreted in isolation, but instead as data points within the broader, real-world context of an employment situation. "For example, an employer may state that typing is an essential function of a position. If, in fact, the employer has never required any employee in that particular position to type, this will be evidence that typing is not actually an essential function of the position." 29 C.F.R. pt. 1630, app. § 1630.2(n).

With this in mind, we are constrained to conclude that the PUC's first argument is without merit. Though the PUC formally requires Compliance Specialists to both appear at and present materials during various kinds of hearings and meetings, the record fails to show that this was actually enforced in practice. Indeed, Robbins testified that she had never been this given this type of task during her time as a Compliance Specialist. HRC Hr'g Tr., 10/16/24, at 88-91. Similarly, Tatjana Roth, Robbins' former supervisor, testified that she had never directed *any* Compliance Specialist to appear at a legislative hearing or similar meeting at *any* point in time, and specifically agreed that this responsibility "was rarely, if ever, assigned to a Compliance Specialist[.]" *Id.* at 184-86. As for concerns regarding access to physical files, Roth testified that she "could not recall" ever needing to scan such files into the PUC's system during the roughly 18-month period during which the blanket work-from-home policy was in effect, while Robbins testified that the issue "might have come up once" during that time frame. *Id.* at 255, 362. Finally, with regard to in-person mail sorting during the pandemic, Roth testified that she would ask her subordinates to voluntarily go into the office to take care of this responsibility, but that this happened occasionally, at a rate of less than one time per week. *Id.* at 362. The record thus reflects that meeting and hearing attendance

9

is a requirement in name only, as well as that in-person physical file review and mail sorting duties are nothing more than "marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Accordingly, the HRC did not abuse its discretion or err as a matter of law when it ruled that in-office work was not an essential function of Robbins' position.

Our conclusion on this point has a clear knock-on effect upon the soundness of the PUC's three remaining arguments. The PUC asserts that "the [HRC's] threshold error, which bleeds into each subsequent error, is its determination that in-office presence was not an essential function of . . . Robbins' position as a Compliance Specialist I." PUC's Br. at 12; *see also id.* at 18-19 (Robbins' request for full-time remote work was unreasonable, because such an accommodation would prevent her from performing the essential function of in-office work); *id.* at 19-22 (Robbins did not engage in the interactive process in good faith, because she refused to countenance accommodations that would enable her to conduct in-person work); *id.* at 22 (Robbins was not constructively discharged, because her requested accommodation was unreasonable and she rejected the PUC's reasonable alternative suggestions that would enable her to work in person). As we have just explained, however, this load-bearing assertion is simply not borne out by the record and, without its presence, the structural integrity of the PUC's remaining arguments collapses completely.[8] Accordingly, none of those arguments provide us with a viable basis for disturbing the HRC's Final Order.

---

[8] This prevents us from substantively addressing certain oddities that are present in this matter, including (a) how Henry, Robbins' healthcare provider, insisted that the only acceptable accommodation was full-time remote work, but Robbins then stated for the first time during the HRC Examiner's hearing that she would be willing to attend meetings in person on an occasional basis; (b) how Robbins seemed to suggest that she was completely incapable of functioning in public work settings, due to the "threat of small talk, of people coming to say hi[,] . . . and that

## III. CONCLUSION

We are therefore constrained to affirm the HRC's Final Order, because its determination that the PUC discriminated against Robbins in violation of Section 5(a) of the Act was neither an abuse of discretion nor legally erroneous, as well as because the record fails to support the PUC's assertion that in-office work was an essential function of Robbins' position.

**LORI A. DUMAS, Judge**

---

really strong pressure to . . . act normal in ways that . . . would be socially acceptable," when working in the PUC's offices; and (c) that Robbins made this statement about her capabilities, while separately acknowledging that she was pursuing a master's degree in clinical counseling (a career path that would certainly require her to become involved in conversations with patients that would go far beyond "small talk," as well as to perform her counseling duties with professionalism and strong emotional discipline). *See* Healthcare Provider Questionnaire, 9/27/22, at 3; Healthcare Provider Questionnaire, 9/30/22, at 1-4; HRC Hr'g Tr., 10/16/24, at 43, 54-55, 61.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pennsylvania Public Utility   :
Commission,   :
           Petitioner   :
  :   No. 382 C.D. 2025
           v.   :
  :
Pennsylvania Human Relations   :
Commission,   :
           Respondent   :

## **O R D E R**

AND NOW, this 9th day of January, 2026, it is hereby ORDERED that Respondent Pennsylvania Human Relations Commission's February 24, 2025 Final Order is AFFIRMED.


**LORI A. DUMAS, Judge**