# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Jane Doyle,                      :
             Appellant         :
                                  :
            v.                    :    No. 469 C.D. 2023
                                  :    Submitted: June 6, 2024
Monroe County Transportation    :
Authority                         :


BEFORE:    HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE LORI A. DUMAS, Judge
                HONORABLE STACY WALLACE, Judge


## *OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE DUMAS                            FILED: August 28, 2024


Jane Doyle (Appellant) appeals from the order of the Court of Common Pleas of Monroe County (trial court) granting in relevant part the Monroe County Transportation Authority's (MCTA) motion for summary judgment.[1] Appellant asserts that the trial court erred by failing to view the evidence in the light most favorable to her. Upon review, we reverse and remand.

---

[1] This is the second time that the parties appear before this Court. Previously, this Court quashed an interlocutory appeal by Appellant because the trial court had not resolved all claims before it. *See Doyle v. Monroe Cnty. Transp. Auth.* (Pa. Cmwlth., No. 566 C.D. 2022, filed July 20, 2022). On remand, the parties entered into a settlement agreement settling all outstanding claims that were ready to proceed to trial. *See* Trial Ct. Order, 5/1/23. Therefore, this appeal may now proceed. *See* Pa.R.A.P. 341.

# I. BACKGROUND[2]

Appellant was hired by MCTA in 2005 as an ombudsman. At that time, Appellant informed Executive Director Peggy Howarth that she had multiple sclerosis (MS). Appellant requested and was granted reasonable accommodations, including flexible work hours and freedom from heavy lifting or other strenuous activities.

In 2008, Appellant took a new position at MCTA as a business development and marketing specialist. This new position required Appellant to split her time between sedentary office work and field work focused on community outreach. Appellant shared these duties with a co-worker, Anthony Giudice. As part of her job, every August, Appellant set up and operated MCTA's booth at the West End Fair. Generally, during preparations for the fair, Giudice or Assistant Executive Director Richard Schlameuss would lift or move any heavy objects. However, Giudice was unavailable to assist with preparations for the 2016 fair due to a family medical emergency.

During Appellant's annual performance review in July 2016, Appellant raised concerns that MCTA was violating Federal Transit Administration (FTA) and Pennsylvania Department of Transportation (PennDOT) rules regarding charter operations of publicly funded transportation agencies by operating bus trips to casinos. Giudice oversaw these casino trips.

On August 11, 2016, Appellant emailed Schlameuss that she had an item for the fair that needed to be picked up from her house. This item was an 8-foot by 4-foot floor panel that weighed 60-70 pounds. Over the next few days, Appellant sent emails to Howarth and Schlameuss that reiterated her concerns with

_____

[2] We state the facts in the light most favorable to Appellant as the non-moving party. *Scarnati v. Wolf*, 173 A.3d 1110, 1118 (Pa. 2017).

2

the casino trips and mentioned she was burdened and stressed with preparations for the fair without assistance from Giudice and that this negatively impacted her health. On August 17, 2016, Howarth responded to Appellant (1) reiterating her belief that MCTA was not violating federal regulations, (2) directing Appellant to forward any calls she received unrelated to the West End Fair to Schlameuss, and (3) encouraging Appellant to inform Schlameuss of "any immediate needs."

In 2016, the fair was held from August 21 to August 27. On August 17 or 18, 2016, Schlameuss arrived at Appellant's house to move the floor panel. Appellant specifically asked for additional assistance from another employee, but none was forthcoming. Appellant expressed trepidation over her ability to move the floor panel with Schlameuss, but they ultimately moved it with "great difficulty."

Appellant only worked at the fair on August 21, 2016, after which, she informed Schlameuss that she would not work at the fair because she was "quite beat." On August 23, 2016, at a routine doctor's appointment, her blood pressure was measured to be 200/120. She then informed Schlameuss and Bob Gress, Human Resources (HR) Director, that she would not return to work until her blood pressure dropped, and they targeted a return date of August 29, 2016. During this time, Appellant complained to Gress regarding the lack of work accommodations and reiterated her concerns that MCTA's casino trips violated FTA regulations.

Appellant did not return to work until September 13, 2016. In a meeting with Schlameuss and Gress, Appellant claims that she was verbally reprimanded for her complaints about the casino trips and that they barely mentioned Appellant's recent health issues. By letter dated September 13, 2016, and signed by counsel, Appellant informed MCTA that she would not return to work until her job-related

3

anxiety subsided, and her blood pressure permitted. Also, Appellant informed MCTA that she had brought MCTA's casino trips to the attention of the FTA.

MCTA discussed their casino trips with the FTA. Thereafter, Howarth sent a letter to the FTA stating that MCTA was discontinuing the casino trips to avoid the appearance of impropriety, despite MCTA's ongoing belief that these trips did not violate FTA regulations. The FTA responded that since MCTA was discontinuing the casino trips, "no formal determination was reached on whether MCTA's shared ride service at issue met the definition of charter service (49 [C.F.R. §] 603.3(c))." FTA Letter, 9/21/16. The next day, Gress sent a memorandum to Appellant attempting to address her concerns over her treatment and informing Appellant that MCTA was discontinuing the casino trips.

Over the next few weeks counsel for Appellant and MCTA exchanged letters stating their clients' positions regarding Appellant's workplace treatment and MCTA's casino trips. Further, Appellant's counsel (1) requested a meeting between Appellant's counsel, Appellant, Howarth, and Gress, (2) stated that Appellant's return to work would be no earlier than her next doctor's appointment on November 4, 2016, and (3) urged MCTA to abide by its past practice of giving employees up to 90 days of family and medical leave, which would extend Appellant's potential leave until December 12, 2016. In response, MCTA's counsel denied the need for a meeting with counsel and stated that Appellant should contact Gress regarding her intended return date.

In an October 25, 2016, letter, Gress informed Appellant that her informal health leave would be extended through November 3, 2016, and requested that Appellant contact him. Appellant did not respond, and she was terminated on December 28, 2016.

4

On August 15, 2017, Appellant commenced this litigation. Relevant to this appeal are Count 3 and Count 8. At Count 3, Appellant alleged that MCTA failed to provide her with reasonable accommodations in violation of the Pennsylvania Human Relations Act (PHRA)[3] by requiring her to lift the floor panel with Schlameuss.[4] Am. Compl. ¶¶ 164-75. At Count 8, Appellant alleged that she was terminated in violation of the Pennsylvania Whistleblower Law.[5] Am. Compl. ¶¶ 208-27. In response, MCTA filed a motion for summary judgment asserting that there was no issue of material fact and that Appellant had failed to state a claim.

On October 29, 2021, the trial court issued an opinion and order granting, in relevant part, MCTA's motion for summary judgment.[6] Ultimately, this order became final and appealable on May 1, 2023, following the settlement agreement reached by the parties as to all remaining claims. Appellant then timely appealed to this Court.

## II. ISSUES[7]

Appellant challenges the trial court's decision to grant MCTA summary judgment on two grounds. First, as to Count 3, Appellant asserts that material questions of fact exist whether MCTA failed to honor well-established workplace accommodations for Appellant's MS. *See* Appellant's Br. at 5, 20-21. Second,

---

[3] Pennsylvania Human Relation Act, Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

[4] This is the only alleged violation of the PHRA at Count 3 relevant to this appeal.

[5] Act of December 12, 1986, P.L. 1559, *as amended*, 43 P.S. §§ 1421-1428.

[6] The trial court granted MCTA summary judgment for each count except for a portion of Count 3 not relevant to this appeal. *See* Trial Ct. Op., 10/29/21, at 31. The trial court's denial of summary judgment for part of Count 3 is what precluded our initial appellate review as that claim was not yet final. *See supra* n.1. On remand, the parties settled all claims except for the two relevant to this appeal. *See* Trial Ct. Order, 5/1/23. Since summary judgment was previously granted for those claims, the previous order became final and appealable.

[7] We have rephrased Appellant's issues for ease of analysis.

regarding Count 8, Appellant asserts that the trial court failed to view the record in the light most favorable to Appellant, thus encroaching upon the role of a factfinder and improperly finding no causation between Appellant's report to the FTA and her subsequent termination by MCTA. *See id.*

## III. DISCUSSION[8]

"Summary judgment is properly entered only when, after examining the record in the light most favorable to the non-moving party, and resolving all doubts as to the existence of a genuine issue of material fact against the moving party, the moving party is clearly entitled to judgment as a matter of law." *Carpenter v. William Penn Sch. Dist.*, 295 A.3d 22, 29 n.5 (Pa. Cmwlth. 2023) (cleaned up). Summary judgment may be granted only in those cases where the right is clear and free from doubt. *Khula v. State Corr. Inst.-Somerset*, 145 A.3d 1209, 1212 (Pa. Cmwlth. 2016).

### A. Count 3 – Reasonable Accommodation

Appellant asserts that when the evidence is viewed in the light most favorable to her, she established MCTA's failure to reasonably accommodate her disability. Appellant's Br. at 20. Appellant points to evidence that MCTA required her to lift a heavy object in preparation for the 2016 fair. *See id.* at 20, 23-29. Further, she asserts that MCTA failed to engage in a good faith interactive process because her requests for assistance went unanswered. *See id.* at 25-26. Therefore, Appellant concludes, because the trial court did not properly credit this evidence, the court erred in granting summary judgment to MCTA. *See id.* at 20, 23-29.

---

[8] On appeal from a trial court's order granting or denying summary judgment, our standard of review is *de novo* and our scope of review is plenary. *Carpenter v. William Penn Sch. Dist.*, 295 A.3d 22, 29 n.5 (Pa. Cmwlth. 2023).

MCTA counters that Appellant failed to produce evidence to establish that she had requested an accommodation or that MCTA had failed to accommodate her. *See* MCTA Br. at 27-34. Additionally, MCTA asserts that Appellant failed to establish an adverse employment action.[9] *See id.* at 35-36.

"Discrimination under the [Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213,] encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Allen v. State Civ. Serv. Comm'n*, 992 A.2d 924, 932 (Pa. Cmwlth. 2010). "The denial of a reasonable accommodation can itself constitute an adverse employment action." *Feliciano v. Coca-Cola Refreshments USA, Inc.*, 281 F. Supp. 3d 585, 592 (E.D. Pa. 2017) (citing *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999)). "A plaintiff bringing a failure-to-accommodate claim must establish: (1) he was disabled, and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated." *Frost v. City of Phila.*, 839 F. App'x 752, 757 (3d Cir. 2021) (citation and internal quotations omitted).[10]

There is no dispute that MCTA knew that Appellant was disabled. Appellant informed Howarth at the start of her employment that she has MS. *See*

---

[9] MCTA also argues that the trial court's order should be affirmed because Appellant failed to establish that she met the statutory definition of "disability." *See* MCTA Br. at 11-23. As noted by Appellant, MCTA raised this issue for the first time on appeal. Appellant's Reply Br. at 1. The trial court recognized that the parties did not dispute that Appellant's MS and hypertension met the statutory definition of "disability." Trial Ct. Op. at 5. It is well established that "[i]ssues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Therefore, MCTA has waived appellate review of the issue of whether Appellant established she suffered from a "disability."

[10] The same legal standard for failure to accommodate claims is applied to both ADA and PHRA claims. *Soutner v. Penn State Health*, 841 F. App'x 409, 415 (3d Cir. 2021).

Doyle Dep. Tr., 11/11/20, at 20-23. Further, there is no reason to believe that Appellant could not be reasonably accommodated. Other than this alleged incident, during Appellant's entire period of employment, she was never required to lift any heavy objects.[11] *See* Howarth Dep. Tr., 11/11/20, at 36-39 (testifying that "[t]here's no way that [Appellant] would request help[,] and someone would say no"). The parties primarily dispute whether the trial court correctly resolved whether Appellant had requested an accommodation or assistance and whether MCTA made a good faith effort to assist her. *See* Appellant's Br. at 23-29; Appellant's Reply Br. at 1-4; MCTA's Br. at 27-34.

To request an accommodation from an employer, a disabled employee may use "'plain English' and need not mention the phrase 'reasonable accommodation.' All that is necessary to request a reasonable accommodation is that the disabled employee makes clear his or her want of assistance or accommodation." *Canteen Corp. v. Pa. Hum. Rels. Comm'n*, 814 A.2d 805, 813 (Pa. Cmwlth. 2003) (internal citations omitted). Also, "circumstances will sometimes require the employer to meet the employee half-way, and if it appears that the employee may need an accommodation but doesn't know how to ask for it, the employer should do what it can to help." *Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 623 (E.D. Pa. 2012) (quoting *Conneen v. MBNA Am. Bank, N.A.,* 334 F.3d 318, 332 (3d Cir. 2003)).

"[O]nce an employee asks for a reasonable accommodation due to a disability, the employer has an obligation to initiate an interactive process with him or her aimed at determining the disabled employee's limitations and any possible

---

[11] Also, "[t]he question of whether a proposed accommodation is reasonable is a question of fact." *Turner v. Hershey Chocolate U.S.*, 440 F.3d 604, 611 n.4 (3d Cir. 2006) (quoting *Buskirk v. Apollo Metals*, 307 F.3d 160, 170 (3d Cir. 2002)).

8

way of accommodating them." *Canteen Corp.*, 814 A.2d at 812. "All the interactive process requires is that employers make a good[]faith effort to seek accommodations." *Taylor*, 184 F.3d at 317. An employer's good faith can be shown "in many ways, such as: meeting with the employee; requesting information about the employee's condition and limitations; asking the employee what accommodation she wants; showing some sign of having considered her request; and offering and discussing available alternatives when the request is too burdensome." *Ruggiero v. Mount Nittany Med. Ctr.*, 736 F. App'x 35, 39 (3d Cir. 2018) (citing *Taylor*, 184 F.3d at 317). "[W]here there is a genuine dispute about whether the employer acted in good faith, summary judgment will typically be precluded." *Taylor*, 184 F.3d at 318.

Here, Appellant was granted a reasonable accommodation excusing her from lifting heavy objects since around the time that she was hired.[12] Despite this established accommodation, Appellant presented evidence that she had requested but was denied assistance in preparing for the fair. For example, a week before the incident, Appellant emailed Schlameuss to coordinate a date for the floor panel to be picked up from her house. Doyle Email, 8/11/16. A couple days before the floor panel was to be moved, Appellant emailed Schlameuss and Howarth to express her concern that Giudice's absence from preparations for the fair had caused her "great hardship" and contributed to her overextending herself. Doyle Email, 8/15/16; Doyle Email, 8/16/16. At the time that Appellant and Schlameuss moved the floor panel, she requested that John Ramos help move the object. Doyle Dep. Tr.,

---

[12] In her Complaint, and throughout her briefs, Appellant asserts that her reasonable accommodation for not lifting heavy objects was limited to her not lifting more than 20 pounds. Am. Compl. ¶ 33; Appellant's Br. at 8, 11, 20, 25-26. However, those portions of the record cited by Appellant do not establish a 20-pound limit, and we are unaware of anywhere in the record where this is established.

9

11/11/20, at 37. Before moving the floor panel, Appellant told Schlameuss that she did not think she could budge it, and Schlameuss responded that they "have to try." *Id.* Viewed appropriately, this evidence established that Appellant made a "plain English" request for a reasonable accommodation. *See Canteen Corp.*, 814 A.2d at 813.

Appellant also had the burden of establishing that MCTA did not make a good faith effort to accommodate her. According to the trial court, the undisputed evidence established that MCTA engaged in good faith because although Giudice was unavailable, Schlameuss helped; Schlameuss offered to have maintenance help; and Schlameuss declined to ask Ramos to help because it was not a part of Ramos's job duties. *See* Trial Ct. Op. at 15. In doing so, the trial court failed to view the evidence in the light most favorable to Appellant.

Viewed appropriately, MCTA may have failed to engage in a good faith interactive process. A week prior to setting up for the fair, Appellant emailed Schlameuss that she had an item at her house that needed to be "picked up." Doyle Email, 8/11/16. Only Schlameuss showed up to carry the 60- to 70- pound floor panel. Given Appellant's physical condition and considering in years past that Giudice and Schlameuss moved objects when setting up for the fair, we fail to see how only Schlameuss showing up to carry the floor panel, effectively forcing Appellant's participation, demonstrated a good faith attempt to accommodate Appellant.

Perhaps the strongest piece of evidence that MCTA made a good faith attempt to accommodate Appellant was Schlameuss's testimony that he told Appellant that he would get maintenance to help and that this offer was denied by Appellant. However, in using this evidence as a basis to grant summary judgment,

10

the trial court failed to view the evidence in the light most favorable to Appellant. *See* Trial Ct. Op., at 10, 15 (citing Schlameuss Dep. Tr., 11/11/20, at 7-8, 21). Appellant testified that in the days before they moved the floor panel her requests for assistance were rejected multiple times. *See* Doyle Dep. Tr., 11/11/20, at 70-71. Further, Appellant testified that she asked for additional assistance, and although she specifically requested that John Ramos help, Appellant also testified that "*it didn't have to be John Ramos*, but [she] just made that suggestion because he had helped out with setting up things in the past." *Id.* at 37 (emphasis added). In other words, viewing the evidence in the light most favorable to Appellant, Schlameuss's testimony that Appellant denied his offer for maintenance to help is contradicted by Appellant's testimony that anyone could have assisted her. Such matters of credibility create a genuine issue of material fact for a jury to resolve. *See Ack v. Carroll Twp. Auth.*, 661 A.2d 514, 516-17 (Pa. Cmwlth. 1995).

Therefore, in granting summary judgment for Count 3, the trial court failed to view the evidence in the light most favorable to Appellant and failed to resolve all doubts as to the existence of a genuine issue of material fact against MCTA. When viewed in that light, Appellant established a prima facie failure to accommodate claim that required resolution of genuine issues of material facts. Thus, the trial court erred as a matter of law in granting MCTA's motion for summary judgment as to Count 3.

### B. Count 8 – Whistleblower Law

Appellant asserts that, when the evidence is viewed appropriately, she established causation between her report of MCTA's alleged wrongdoing and the various adverse employment actions taken against her. Appellant's Br. at 20-21, 41-44; Appellant's Reply Br. at 6-17. Thus, according to Appellant, the trial court erred

11

in granting summary judgment. *See id.* Additionally, Appellant asserts that a genuine issue of material fact exists regarding whether MCTA's casino trips constituted a "wrongdoing" and whether it was a technical or minimal violation.[13] *See* Appellant's Reply Br. at 17-21.

In response, MCTA asserts that most of its alleged actions did not constitute adverse employment actions and, even so, Appellant failed to establish a causal link between the supposed adverse employment actions and her whistleblowing. MCTA's Br. at 47-59. Additionally, MCTA maintains that its casino trips did not constitute a "wrongdoing" because they did not violate federal regulations, but if they did, any violation was merely technical or minimal. *See id.* at 37-47.

"[T]he Whistleblower Law precludes a public body from taking any adverse employment action against an employee in retaliation for the employee's good faith report of wrongdoing or waste." *Scrip v. Seneca*, 191 A.3d 917, 925 (Pa. Cmwlth. 2018) (*en banc*) (citing Section 3 of the Whistleblower Law, 43 P.S. § 1423).[14] A "good faith report" is defined as "a report of . . . wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." Section 2 of the

---

[13] Appellant also points out that the trial court never addressed the issue of "wrongdoing" and, thus, questions whether it is an issue appropriate to be addressed on appeal. *See* Appellant's Reply Br. at 17; Appellant's Br. at 40.

[14] Section 3(a) of the Whistleblower Law states:

(a) Persons not to be discharged.--No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

Section 3(a) of the Whistleblower Law, 43 P.S. § 1423(a).

Whistleblower Law, 43 P.S. § 1422. "[W]rongdoing" is defined as a "violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."[15] *Id.* Further, the law allegedly violated "must specifically define some prohibited conduct or it cannot be violated in a way that constitutes a 'wrongdoing.'" *Sukenik v. Twp. of Elizabeth*, 131 A.3d 550, 556 (Pa. Cmwlth. 2016). Lastly, the employee must show a causal connection between the report of wrongdoing and the adverse employment action. *Javitz v. Luzerne Cnty.*, 293 A.3d 570, 579 (Pa. 2023).

### 1. Adverse Employment Action

We agree with MCTA that most of the alleged incidents do not constitute adverse employment actions. However, viewing the evidence in the light most favorable to Appellant, we conclude that Appellant has provided evidence supporting three alleged adverse employment actions: (1) removal from telephone duty, (2) the denial of her reasonable accommodation, and (3) her ultimate termination.

This Court has specifically defined an adverse employment action as follows:

> An adverse employment action is an action that a reasonable employee would have found to be materially adverse, such that the action well might have dissuaded a reasonable worker from taking a protected action. An employee must show only that a reasonable person would believe their working conditions had

---

[15] Our Supreme Court has recently stated that the Whistleblower Law protects employees "from adverse employer action following a report of actual or suspected violation of federal, state or local law[.]" *Javitz v. Luzerne Cnty.*, 293 A.3d 570, 578 (Pa. 2023) (first citing *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 307 (Pa. 2015); then quoting Section 1 of the Whistleblower Law, 43 P.S. § 1421, Historical and Statutory Notes)).

13

been altered to establish an adverse employment action. Adverse employment actions may include demotion and transfers to less desirable positions.

*Vasil v. Dep't of Mil. & Veterans Affs.*, 230 A.3d 529, 538-39 (Pa. Cmwlth. 2020) (internal quotations and citations omitted).

Termination is clearly an adverse employment action. *See LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007). Also, denying an employee a reasonable accommodation would alter an employee's working conditions by either requiring them to perform the job without the accommodation or limiting an employee's job duties to only those tasks that could be accomplished without a reasonable accommodation. *See Feliciano*, 281 F. Supp. 3d at 592.

Finally, a reasonable employee in Appellant's situation could believe their working conditions had been adversely altered when MCTA directed Appellant to forward any calls unrelated to the West End Fair, including calls related to the casino trips, to other employees. Answering these calls was within her established job duties. In her email to Howarth, Appellant indicated that because she had recently answered several phone calls regarding the casino trips that it had "become more obvious" to her that MCTA was violating charter regulations. *See* Doyle Email, 8/16/16. Howarth responded by directing her to forward calls related to the casino trips to other staff. *See* Howarth Email, 8/17/16. Considering these calls pertained to the matter that Appellant alleged was a wrongdoing, such action "well might have dissuaded a reasonable worker" from reporting the alleged wrongdoing. *See Vasil*, 230 A.3d at 538-39.

### 2. Causation

Next, we address causation. Appellant argues that viewing the evidence in the light most favorable to her, a reasonable jury could infer causation

14

between her reports of wrongdoing and the employment actions taken against her. *See* Appellant's Br. at 20-21. MCTA rejects any causal relationship between Appellant's report of wrongdoing and her termination.[16] *See* MCTA Br. at 47-48, 56-58. According to MCTA, Appellant was terminated because their relationship deteriorated, and Appellant had exhausted her leave time. *See id.* at 56. In response, Appellant asserts that the deterioration of her relationship with MCTA does not nullify the causal relationship between her reports of wrongdoing and her termination because her relationship with MCTA did not deteriorate until after she reported her concerns. *See* Appellant's Reply Br. at 10.

"[C]ausation may be established by 'concrete facts or surrounding circumstances' but not by an employee's conclusory perception of how others treated him after making a report of alleged wrongdoing." *Javitz*, 293 A.3d at 582 (quoting *Golaschevsky v. Dep't of Env't Prot.*, 720 A.2d 757, 759-60 (Pa. 1998)). Also, "the mere fact that the discharge occurred a few months after a report of wrongdoing and that the first formal negative actions by the employer occurred after the report are not enough to show a causal connection." *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070-71 (Pa. Cmwlth. 2013) (citing *Golaschevsky*, 720 A.2d at 759-60). However, a plaintiff may establish the requisite causal connection through either "(1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Javitz*, 293 A.3d at 586 n.20 (quoting *Ferraro v. Temple Univ.*, 185 A.3d 396, 405 (Pa. Super. 2018)).[17] When considering

---

[16] MCTA does not assert an argument against causation between Appellant's report and the reasonable accommodation denial or removal from duty. *See* MCTA's Br. at 47-50.

[17] In *Javitz*, our Supreme Court recognized that whistleblower claims and "cases involving the PHRA, Title VII and First Amendment retaliation claims utilize an essentially identical analytical

15

whether temporal proximity alone establishes causation, "days are suggestive; months are not[.]" *Id.* (quoting *Rosati v. Colello*, 94 F. Supp. 3d 704, 717 (E.D. Pa. 2015)).

Here, viewing the evidence in the light most favorable to Appellant, she established causation between the adverse employment actions and her report of wrongdoing. In Appellant's annual employee review, she was recognized as an exceptional employee. *See* Annual Employee Appraisal, 7/20/16. During that review, Appellant told Schlameuss that MCTA was "pushing the envelope on these group trips." Answer to MCTA's First Interrog. at 24. Thereafter, Appellant emailed Schlameuss and Howarth her concerns regarding the casino trips on August 15 and 16, respectively. *See* Doyle Email, 8/15/16; Doyle Email, 8/16/16. On the following day, Howarth responded by modifying Appellant's job responsibilities, directing her to forward calls related to the casino trips to Schlameuss. *See* Howarth Email, 8/17/16. Also, that same day, MCTA failed to accommodate Appellant's disability when Schlameuss arrived at Appellant's house to move the floor panel with no additional assistance. The passage of only one or two days between Appellant's complaints to Schlameuss and Howarth and these adverse employment actions is "unusually suggestive" of causation. *See Javitz*, 293 A.3d at 586 n.20. Therefore, the trial court erred in finding that Appellant failed to establish prima facie causation between her good faith report of wrongdoing and the adverse employment actions of directing Appellant to forward calls related to the casino trips and failing to accommodate Appellant.

---

framework" for establishing causation. *Javitz*, 293 A.3d at 586 n.20. This framework considers "the temporal relationship between the protected activity and the retaliatory discharge and/or a pattern of antagonism perpetrated by the employer in the period between the occurrence of the protected activity and the adverse employment consequence." *Id.* (citing Pennsylvania and Federal cases addressing causation under the PHRA, Title VII and First Amendment retaliation claims).

16

Appellant was terminated about five months after her initial report of wrongdoing. This months-long delay is not unusually suggestive of causation. *See Javitz*, 293 A.3d at 586 n.20. However, viewing this evidence in Appellant's favor, her eventual termination followed a pattern of antagonistic behavior from which a factfinder could infer causation. *See id.*

The trial court noted that Appellant was terminated because she used her leave time and Appellant and MCTA's "relationship had deteriorated due to the interactions that had occurred over the course of four months." Trial Ct. Op. at 29. Further, the trial court remarked that "[t]here is nothing to suggest that the deterioration occurred because of [Appellant] reporting concerns to MCTA or FTA." *Id.* Rather, according to the trial court, "[t]he record suggests that the deterioration occurred as a result of the way in which [Appellant] handled her concerns." *Id.* at 29-30. In this respect, the trial court failed to view the record in the light most favorable to Appellant.

During the fair, Appellant's doctor recommended that Appellant take off from work because her blood pressure was 200/120. Appellant returned to work a few weeks later for what would be her last day of employment. While Appellant was out of work, she again sent a document to MCTA, this time to Gress, expressing her concerns over the casino trips. *See* Doyle Letter, 8/28/16. When she returned to work on September 13, 2016, she claimed that in a meeting with Gress and Schlameuss, she was told "to be quiet more or less[]" and they showed little concern for the health issue requiring her medical leave. *See* Doyle Dep. Tr., 11/11/20, at 98-100. Appellant did not return to work after that day. Shortly thereafter, Appellant, through counsel, sent MCTA a letter that explained that she would not return to work until "her job-related anxiety subsides, and her blood pressure

17

allows." Doyle Letter, 9/13/16. The letter reiterated Appellant's concerns about the casino trips and stated that since Howarth, Schlameuss, and Gress have already reviewed the matter that it be referred to the Board of Directors. *Id.* Appellant and MCTA failed to resolve their disputes. Thus, Appellant did not return to work and was eventually terminated because she used all her leave time and continued to miss work. Viewing the evidence in the light most favorable to Appellant, a factfinder could infer a causal connection between Appellant's report of wrongdoing and her termination.

Lastly, a genuine dispute of material fact exists regarding whether MCTA's casino trips were a wrongdoing. A violation of a federal statute or regulation constitutes a wrongdoing. *See* Section 2 of the Whistleblower Law, 43 P.S. § 1422. Governmental transportation authorities that receive federal financial assistance are precluded from providing "charter bus transportation service outside the urban area in which [they] provide[] regularly scheduled public transportation service." *See* 49 U.S.C. § 5323(d).[18] Transportation is considered a "charter service," in part, if the service is paid for by a third party. *See* 49 C.F.R. § 604.3 (2008).[19]

---

[18] The statute provides:

Financial assistance under this chapter may be used to buy or operate a bus only if the applicant, governmental authority, or publicly owned operator that receives the assistance agrees that, except as provided in the agreement, the governmental authority or an operator of public transportation for the governmental authority will not provide charter bus transportation service outside the urban area in which it provides regularly scheduled public transportation service.

49 U.S.C. § 5323(d).

[19] (c) "Charter service" means, but does not include demand response service to individuals:

    (1) Transportation provided by a recipient at the request of a third party for the exclusive use of a bus or van for a negotiated price. The following features may be characteristic of charter service:

Here, Appellant informed MCTA that she believed that MCTA's casino trips were inconsistent with public transportation in violation of federal charter rules, in part, because of questions surrounding whether the casino was paying MCTA for the trips. *See* Doyle Email, 8/15/16; Doyle Email, 8/16/16; Doyle Letter, 8/28/16. In a letter to the FTA, Howarth stated that she understood that both MCTA and the FTA agreed that MCTA did not provide charter services. *See* Howarth Letter, 9/19/16. However, in response the FTA corrected MCTA that it never made a "formal determination" but based on the facts, the FTA may have ultimately determined that MCTA violated federal charter regulations.[20] *See* FTA Letter, 9/21/16. Viewing the evidence in the light most favorable to Appellant, she raised a question of fact regarding whether MCTA's actions violated federal charter rules and thus constituted a wrongdoing.[21]

---

(i) *A third party pays the transit provider a negotiated price for the group*;
(ii) Any fares charged to individual members of the group are *collected by a third party*;
(iii) The service is not part of the transit provider's regularly scheduled service, or is offered for a limited period of time; or
(iv) A third party determines the origin and destination of the trip as well as scheduling; or

(2) Transportation provided by a recipient to the public for events or functions that occur on an irregular basis or for a limited duration and:

(i) A premium fare is charged that is greater than the usual or customary fixed route fare; or
(ii) The service is *paid for in whole or in part by a third party*.

49 C.F.R. § 604.3 (2008) (emphasis added).

[20] In its brief, MCTA even acknowledges that "MCTA and the FTA finally agreed that the cash incentives provided by the casinos to passengers could possibly raise the appearance that the 'service is paid for in whole or in part by' the third-party casino." MCTA Br. at 45-46.

[21] MCTA also asserts, in conclusory fashion, that even if MCTA violated federal charter rules it was merely a "technical or minimal violation." *See* MCTA Br. at 45-47. Appellant asserts that "[t]he [t]rial [c]ourt opinion does not discuss this aspect but simply seems to assume there was a violation. As such, it was not a grounds for appeal by [Appellant]." Appellant's Reply Br. at 17.

# IV. CONCLUSION

The trial court erred by not considering the evidence in the light most favorable to Appellant. As to Count 3, viewing the evidence appropriately, Appellant established that she was denied a reasonable accommodation, and a genuine dispute of material fact exists regarding whether MCTA engaged in a good faith interactive process in trying to accommodate her.

As to Count 8, the trial court erred in finding that Appellant's removal from phone calls related to casino trips, MCTA's failure to provide reasonable accommodations, and her ultimate termination were not adverse employment actions. *See Vasil*, 230 A.3d at 538-39. Additionally, viewing the evidence appropriately, Appellant established prima facie causation between her report of alleged wrongdoing and these adverse employment actions. *See Javitz*, 293 A.3d at 582, 586 n. 20. Finally, although the trial court never addressed whether MCTA engaged in "wrongdoing," we discern a genuine dispute of material fact in this regard.

For these reasons, we conclude that the trial court erred in granting summary judgment to MCTA. Accordingly, we reverse the trial court's order as to Count 3 and Count 8 and remand this matter for further proceedings.

_____
**LORI A. DUMAS, Judge**

---

Further, Appellant asserts that a genuine dispute of material fact exists because the FTA did not consider the suspected violation as a "technical or minimal violation" because it contacted MCTA within a week of being informed and MCTA immediately ended the casino trips. *See* Appellant's Reply Br. at 18-19.

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

Jane Doyle,                                          :
                    Appellant                        :
                                                     :
          v.                                         :     No. 469 C.D. 2023
                                                     :
Monroe County Transportation                         :
Authority                                            :

# **O R D E R**

AND NOW, this 28th day of August, 2024, the order of the Court of Common Pleas of Monroe County, entered October 29, 2021, is REVERSED, and this matter is remanded for further proceedings.

Jurisdiction relinquished.

_____
**LORI A. DUMAS, Judge**